Louise H. Edwards, et al. [1] v. Commissioner. Louise H. Edwards v. Commissioner
Docket Nos. 24909-24914.
United States Tax Court
1953 Tax Ct. Memo LEXIS 79; 12 T.C.M. (CCH) 1202; T.C.M. (RIA) 53344; October 28, 1953
Chester H. Ferguson, Esq., 215 Madison Street, Tampa, Fla., George W. Ericksen, Esq., and Rex Meighen, C.P.A., for the petitioners. Newman A. Townsend, Jr., Esq., for the respondent. TURNER Memorandum findings of fact and opinion TURNER, Judge: Respondent has determined that petitioners are liable as transferees for deficiencies in income tax, declared value excess profits tax and excess profits tax and a 25 per cent addition to tax under *80 section 291 of the Internal Revenue Code, due by Dixie Groves Company, transferor, in amounts and for taxable years as follows: Declared Value
Income
Excess
Excess
Addition
Fiscal Year
Tax
Profits Tax
Profits Tax
to Tax
Ended August 31, 1944
$2,150.00
$5,360.29
$76,148.36
Ended August 31, 1945
3,865.78
22,612.62
Ended September 1 to
November 10, 1945
686.70
36,494.11
$9,295.21
The questions presented for determination are (1) whether any part of the lump-sum purchase price of certain citrus groves with growing fruit on the trees at the time of purchase may properly be allocated as the cost of such fruit and taken into account as such cost in computing the gain realized when the fruit is later harvested and sold; (2) if so, the amount of the cost of the fruit; (3) whether the Court has jurisdiction for a taxable period beginning September 1, 1945; and (4) if so, whether Dixie Groves Company in such taxable period realized income by reason of a right to a divided or "unabsorbed premium" on a mutual insurance policy against frost damage to its citrus crop for a period beginning October 20, 1944, and ending *81 on September 1, 1945. Findings of Fact Some of the facts have been stipulated and are found as stipulated. Petitioners L. C. Edwards, Jr., W. F. Edwards, Louise H. Edwards, Katherine T. Edwards and M. E. Price are individuals, who reside at Dade City, Florida. Petitioner Triple E Development Company, hereinafter called Triple E, is a Florida corporation, and has its principal place of business at Dade City. Dixie Groves Company, Inc., sometimes referred to as Dixie Groves, was a corporation, organized under the laws of Florida. It kept its books and filed its tax returns on an accrual basis and for a fiscal year ending August 31. It filed its tax returns for the taxable periods involved with the collector of internal revenue for Florida. A return styled as being for the fiscal year ended August 31, 1946, was delinquently filed on November 14, 1947. In April of 1943, L. C. Edwards, Jr., was told by a friend and real estate agent that there was a good buy in certain citrus groves, and on or about April 20, 1943, he inspected the properties. He found that a large crop of fruit was set on the trees and so advised some of his relatives and business associates. They decided that *82 the properties should be bought, but that they should be taken over by a corporation to be formed, and in order to assure the purchase, Edwards, as trustee, executed purchase agreements. These agreements were executed on or about April 28, 1943, with Peninsular Distributing Corporation, referred to hereinafter as Peninsular, and Fugazzi Bros., Inc., for the purchase of certain citrus properties for considerations of $85,000 and $165,000, respectively. Both contracts provided, inter alia, the following: "(2) It is understood and agreed between the parties hereto that the aforesaid real estate ['property', in the Peninsular agreement] consists largely of land upon which there is growing citrus trees, upon which trees there is some matured fruit of the 1942-1943 crop season and also upon which a new crop of the 1943-1944 season is now setting. It is agreed that the remaining fruit of the 1942-1943 crop season, which is still upon the trees, shall remain and be the property of the Seller and it shall retain the privilege of ingress and egress at such times as it may see fit to pick and remove the fruit. It is understood and agreed that all unmatured fruit setting for the 1943-1944 season *83 shall become and be the property of the Buyer. The privilege is hereby granted to the Buyer upon the execution of this agreement to enter upon the premises for the purpose of cultivating, fertilizing and spraying and other care of the grove as the Buyer shall desire. * * *
"(5) It is understood and agreed that this contract shall not be recorded and any attempt to record the same shall be a forfeiture of all of the rights hereunder by the party so seeking to record the same. It is further agreed that this agreement is not to be assigned by the Buyer, except that the Buyer hereinbefore named may nominate a party, corporate or individual, to whom the conveyance may be made." In the contract with Fugazzi Bros., Inc., the following provision was included: "(4) It is understood and agreed that the Seller is now placing ferttilizer on the said lands and that upon the closing of this contract the Buyer will pay to the Seller the sum of $908.80 to cover the cost of the fertilizer now being used by the Seller." Cash deposits, $20,000 for Fugazzi Bros., Inc., and $35,500 for Peninsular, were made in a bank, under an escrow agreement, to be paid to the seller (less commission to *84 broker), together with the balance of the purchase price in cash, on the delivery of warranty deed and after demonstration by the abstracts on the properties of a good and merchantable title, with the usual provisions in such an instrument for the seller to cure title defects within 60 days. If the seller should be unable to cure title defects within 60 days, the buyer had the option of terminating the contract and having the escrow deposits returned. In the event of the failure of the buyer to conclude the purchases after being offered good and merchantable titles and warranty deeds, the cash payments made by the buyer into escrow were to be paid to the seller "as rental" for the premises during the life of the contract. On or about May 17, 1943, Dixie Groves Company, Inc., was organized to take over the above purchase agreements of the Fugazzi and Peninsular properties. Its original stockholders were H. S. Massey, L. C. Hawes, M. E. Price, C. H. Edwards, Katherine T. Edwards, W. F. Edwards and his wife, Louise H. Edwards. Each one had an equal interest with the exception of M. E. Price, whose interest was slightly smaller. M. E. Price is the cousin of C. H. Edwards and the sister *85 of W. F. Edwards and L. C. Edwards, Jr., the latter not being an original stockholder of Dixie Groves. Katherine T. Edwards is the wife of L. C. Edwards, Jr., and H. S. Massey and L. C. Hawes were his business associates. L. C. Hawes, C. H. Edwards and H. S. Massey sold their stock in Dixie Groves to Triple E in August or September, 1945. The stock of Triple E was owned as follows: W. F. Edwards, 25 per cent; L. C. Edwards, Jr., 25 per cent; and J. E. Evans, 50 per cent. On or about May 24, 1943, the board of directors of Dixie Groves held its first meeting, at which "the attention of the Board of Directors was called to the fact that prior to organization of the corporation two certain contracts had been made, one with Fugazzi Brothers, Inc. and one with Peninsular Distributing Corporation, by which it was proposed that the corporation would purchase from said two corporations certain citrus groves, the citrus fruit of the 1943-44 season now on the trees and certain grove machinery and equipment, which said property is located in what is generally known as the Limona-Valrico Sections of Hillsborough County, Florida; the contract with Fugazzi Brothers, Inc. providing for the purchase *86 of the property at a round sum of $165,000.00 to include the purchase price of the citrus fruit on the trees, the machinery, equipment and supplies. The contract with the Peninsular Distributing Corporation provided for a round purchase price of $85,500.00 for the citrus fruit now maturing on the trees and the groves." The matter was discussed and "upon motion duly made, seconded and passed, it was ordered that the contract heretofore made prior to organization but upon behalf of the corporation between Fugazzi Brothers, Inc. and L. C. Edwards, Jr., as Trustee, and the Peninsular Distributing Corporation and L. C. Edwards, Jr., as Trustee, both dated the 28th day of April, 1943, be taken over by the corporation and the corporation substitute for the said L. C. Edwards, Jr., as Trustee, shown in each of said contracts as Buyer, and that this corporation proceed as such buyer to carry out the contract." Pursuant to the resolution, Dixie Groves took over the above-described purchase agreements theretofore made in its behalf by L. C. Edwards, Jr., as trustee. On or about June 15, 1943, Fugazzi Bros., Inc., conveyed the citrus properties described in the contract of April 28, 1943, to *87 Dixie Groves for a consideration of $131,533.20, and by a bill of sale executed and delivered the same day, conveyed the goods, chattels, machinery and equipment described in that contract to Dixie Groves for a consideration of $33,466.80. On or about June 22, 1943, Peninsular conveyed the citrus properties described in the contract of April 28, 1943, to Dixie Groves for a consideration of $85,500. On or about May 11, 1944, Dixie Groves purchased a citrus property from Ella J. Altman for a consideration of $1,500, which property adjoined property that had been acquired from Peninsular. On its books, the $1,500 was allocated $750 to land, trees, etc., and $750 to the cost of the citrus crop purchased and on the grove at the time of acquisition. About one year after the acquisition of the groves, Dixie Groves began to irrigate them and over a period of years installed irrigation equipment at a cost of $25,000 to $30,000. The primary purpose for irrigating the groves was to raise early bloom fruit. The properties acquired by Dixie Groves are situated in the Limona-Valrico region of Florida and are sometimes referred to hereafter as the Valrico Groves. The area lies in a basin *88 or valley known as the Valrico Valley which in citrus growing circles is regarded as a "cold spot." The properties acquired by Dixie Groves consisted of 935.9 acres of land, 392.8 of which were in citrus groves. The Valrico Groves had been damaged by cold temperatures in the years 1917, 1934 and 1940. The low places are the "cold spots" and it is there that most damage occurs. There are ridges or high places in the Valrico basin, but they do not rise above the outer rim of the basin. Due to the freezes in 1917, 1934 and 1940, the trees in the lowest places in the basin were wiped out and those groves were abandoned. The trees that survived were growing on the slopes or tops of the ridges, where they had better protection from the cold. Trees that are partly damaged may be pruned or cut back and, depending on the size of the root system, they will grow to normal production. It takes some trees about five years to reach normal production again. A lesser degree of cold may damage fruit and not the trees. The older the tree, the greater is its resistance against cold. In 1943 there were many large trees in the Valrico Groves in question. They were located on the higher places. There *89 were practically no trees in the low spots. The trees there had been frozen and the land was no longer used for citrus growing purposes. One of the most dreaded hazards faced by a citrus grower or producer is cold weather, which is calculated to do damage at some time during a period of years, and yet the effect of cold on a tree or grove is unpredictable. So far as appears, the trees have not been damaged by a freeze since 1940. Some fruit was damaged in 1950, but it was salvaged through the Pasco Packing Association, a cannery or processing organization, and was not a complete loss. The Pasco Packing Association was one of the largest concerns of its kind in Florida and Dixie Groves had made a connection with it in 1943. A connection with a cannery supplies a means of substantially reducing loss from cold damage to citrus fruit. Mature fruit which has been frozen may not be marketable as fresh fruit but may be completely or almost wholly salvaged by processing, and fruit which has been damaged by cold temperatures while still immature will at times develop sufficiently for the production of juice. An estimated tree count in the above Fugazzi and Peninsular Groves in 1943, *90 as made in or about the year of their purchase by Dixie Groves, was 23,550. An actual tree count in the same groves in 1951 was 32,035, of which 4,090 trees were three to six years of age and were not in the groves in 1943, 4,038 Valencias were twelve years old, while the remaining 23,907 were from fifteen to fifty years of age, most of this remainder being from fifteen to thirty years old. There was no count of trees which had been in the groves in 1943 but which had since died or otherwise been removed. Citrus trees normally bloom between February 15 and March 15 and young fruit begins to set on the tree in March. There was an early bloom in 1943 on the Valrico Groves and in mid-April the fruit was well-set, indicating that there would be a large crop of fruit. The crop was due to mature between October and February of the 1943-1944 citrus season, depending on the variety involved. Before reaching maturity the crop might be subject to the hazards of cold, hurricanes, drought, excessive rainfall and price fluctuations. Immature crops, without the groves, are not normally bought and sold in April. The purchase prices of the Fugazzi and Peninsular Groves, exclusive of the $33,466.80 *91 in the Fugazzi transaction, shown as having been paid for goods, chattels, machinery and equipment, were set up on the books of Dixie Groves as follows: Allocations
Seller
Total
Land,
Citrus
or Name
Purchase
Build-
Crop
of Grove
Price
ings, Trees
on Trees
Fugazzi
$131,533.20
$30,200.00
$101,333.18
Peninsular
85,500.00
18,989.90
65,510.10
Totals
$217,033.20
$50,189.92
$166,843.28 These allocations were based on figures submitted to Dixie Groves by three individuals who made appraisals of the groves for it. The appraisals were dated August 16, 1943, August 20, 1943, and September 21, 1943. They were made as of June 1943, as of late June or early July, 1943, and as of June or July, 1943. The book entries covering the above purchases were arrived at by use of the figures submitted by the three appraisers, as follows: Appraiser
Total
Land
Bldgs.
Trees
Fruit
Fugazzi Property: D. D. Covington
$132,000.00
$2,500.00
$12,000.00
$17,500.00
$100,000.00
L. W. Lee
129,500.00
2,500.00
11,500.00
18,500.00
97,000.00
Jack A. Johnston
137,000.00
2,000.00
10,000.00
15,000.00
110,000.00
Total
$398,500.00
$7,000.00
$33,500.00
$51,000.00
$307,000.00
Average
132,833.33
2,333.33
11,166.67
17,000.00
102,333.33
Percentage
100.00
1.75
8.41
12.80
77.04
Actual cost
131,533.20
2,301.83
11,061.94
16,836.25
101,333.18
Peninsular Property: D. D. Covington
$ 85,000.00
$3,000.00
$ 1,000.00
$16,000.00
$ 65,000.00
W. W. Lee
90,500.00
2,500.00
1,000.00
17,000.00
70,000.00
Jack A. Johnston
79,000.00
2,000.00
2,000.00
15,000.00
60,000.00
Total
$254,500.00
$7,500.00
$ 4,000.00
$48,000.00
$195,000.00
Average
84,833.33
2,500.00
1,333.33
16,000.00
65,000.00
Percentage
100.00
2.95
1.57
18.86
76.62
Actual cost
85,500.00
2,522.25
1,342.35
16,125.30
65,510.10
*92 During the fiscal year ended August 31, 1944, Dixie Groves realized the gross amount of $242,540.06 from the sale of fruit harvested from the crops on the trees at the time of the purchase of the Fugazzi, Peninsular and Altman Groves. By types, the fruit so harvested and sold was as follows: No. of Boxes
Cannery fruit: Oranges
55,680
Grapefruit
90,618
146,298
Packing house fruit:
4,094
Total
150,392
With respect to its fruit sales for the fiscal year ended August 31, 1944, Dixie Groves, on its income tax return, reported the following: Gross Sales:
$242,540.06
Less: Cost of Goods sold: Inventory at August
31, 1943
$194,608.03
Fruit Purchases
750.00
Development Costs
85,745.64
281,103.67
Gross Profit (loss)
$ (38,563.61)
The amount shown as inventory at August 31, 1943, is made up of $166,843.28, as representing the cost of the citrus crop on the Fugazzi and Peninsular Groves at the time of purchase and arrived at as previously indicated, and $27,764.75, representing the cost of grove care incurred by Dixie Groves through August 31, 1943. The $750 shown as fruit purchases is the amount which was allocated *93 by Dixie Groves as the cost of the citrus crop on the Altman Grove at the time of purchase. In the notice of liability mailed to the petitioners for the fiscal year ended August 31, 1944, the respondent disallowed the item of $166,843.28, so claimed as cost of goods sold, but allowed the item of $27,764.75 covering the expenses incurred for grove care to August 31, 1943. He also disallowed as a part of the cost of goods sold the item of $750, which had been allocated by Dixie Groves to the fruit on the Altman Grove at the time of purchase. The four income tax returns filed to cover the period of existence of Dixie Groves showed gross sales and net losses as follows: Period
Gross
Net
Ending
Sales
Losses
8-31-43
None
$ 3,211.59
8-31-44
$242,540.06
57,227.66
8-31-45
259,439.16
8,261.46
8-31-46
None
8,124.15
In keeping its books and reporting its income, Dixie Groves did not use inventories of its citrus fruit. The prospects for advances in fruit prices for 1943 were good. Government purchases had started, making the prices during the season of 1942 and 1943 the best since 1929 and 1930, and growers had been warned of a Government "set-aside" *94 of substantially half of the citrus crop. Grove prices started increasing about the first of 1943. Such were the trends, even though in the 1942-1943 season the citrus industry had been faced with shortages in materials and labor, and problems in transportation, all of which continued into the 1943-1944 season. The 1942-1943 prices of Florida citrus fruit on the trees, by months, were as follows: Early and
Late Type
Mid-season
(Valencia)
Seedless
Seeded
Month
Type Oranges
Oranges
Grapefruit
Grapefruit
October
$2.18
$1.00
$ .88
November
1.51
.88
.75
December
1.82
.77
.72
January
1.05
.77
.73
February
1.31
$1.55
.83
.83
March
1.62
1.91
1.15
.99
April
1.57
1.93
1.20
1.05
May
2.17
1.42
1.25
June
2.24
1.46
1.32
July
2.27
1.47
1.29
Season Average
1.47
2.02
1.04
.85
Season averages of Florida citrus fruit on the tree for the seasons from 1940 through 1948 were as follows: SEASON AVERAGE OF FRUIT PRICES
Equivalent Prices of Fruit on the Tree
All Methods of Sale
Oranges
Grapefruit
Early and
Mid-season
Late
Seedless
Seeded
Season
1940-41
$ .64
$ .98
$ .43
$ .29
1941-42
.90
1.35
.73
.56
1942-43
1.47
2.02
1.04
.85
1943-44
1.61
2.06
1.35
1.28
1944-45
1.98
2.45
1.76
1.67
1945-46
2.09
2.67
1.33
1.23
1946-47
.84
1.10
.64
.62
1947-48
.66
.60
.33
.20
*95 The 1942-1943 Florida citrus production set a record high for the state. Production on the part of the Valrico Groves bought by Dixie Groves from Fugazzi Bros. Inc., during the 1941-1942 and 1942-1943 seasons was as follows: Season
Season
1941-1942
1942-1943
Boxes
Boxes
Oranges
12,129 1/2
23,963    Grapefruit
19,787    31,895    Lemons
45 1/2
Totals
31,916 1/2
55,903 1/2
The 1941-1942 production of that part of the Valrico Groves purchased from Peninsular by Dixie Groves is unknown. However, during the 1942-1943 season that part of the Valrico Groves produced the following: Oranges
12,734 Boxes
Grapefruit
4,787 Boxes
For years subsequent to their purchase by Dixie Groves, production of citrus fruit in boxes on groves acquired from Fugazzi Bros. Inc., Peninsular, and Ella J. Altman was as follows: CROP YEARS
1943-1944
1945-1946
1946-1947
1947-1948
1948-1949
1949-1950
Early and Mid-season Oranges
55,680
49,528
30,406
31,986
29,509
31,537
Valencia Oranges
39,023
61,623
62,703
50,160
Grapefruit
90,618
55,183
82,881
80,402
77,296
82,826
Tangerines
4,094
2,565
3,779
4,350
4,569
6,199
Total
150,392
107,276
156,089
178,361
174,077
170,722
*96 Some of the Valrico acreage acquired by Dixie Groves in 1943 and which had no citrus trees fronted on the Tampa-Bartow highway. In June 1945, Dixie Groves sold nineteen acres of this land at $75 per acre. In late 1942 and early 1943, the Edwards-Hawes Company, in which L. C. Edwards, Jr., and Massey had interests, purchased citrus groves, including the fruit on the trees, as follows: Cost
Date of
(Includ-
Cost per
Purchase
Acres
ing Fruit)
Acre
October 9, 1942
50
$15,000 $300
October 11, 1942
30
5,500
183
December 20, 1942
20
8,000
400
January 28, 1943
20
6,500
325
January 28, 1943
40
12,500
312 These groves, which were in Pinellas County, were regarded as being located in a warm area. The groves "were in fairly good condition, carrying a fair to good crop." For the period beginning October 20, 1944, and expiring on September 1, 1945, Dixie Groves insured its citrus crop against loss from frost damage with Growers Mutual Insurance Company of Dade City. The premium paid on the policy was $52,660. It was deducted by Dixie Groves on its income tax return for the fiscal year ended August 31, 1945, and was allowed by the respondent *97 in his determination of deficiency against Dixie Groves and in his determination of transferee liability herein. Growers Mutual Insurance Company, sometimes referred to as Growers Mutual, is a domestic mutual insurance company, and was organized on or about September 19, 1944, under the insurance laws of the State of Florida. It was "formed and authorized to, among other things, engage in the business of making insurance and assuming risks therefor on property against loss or damage by fire, lightning, hail, tempest, earthquake and frost." Its principal place of business was at Dade City. Growers Mutual was owned and operated by its members, and its members were its policyholders, each having one vote. It had no capital stock or stockholders. The income and funds of the company were covered by sections 3 and 4 of Article VI of the company's by-laws, as follows: "Section 3 - All income coming into the company, either by way of premiums earned and collected, interest or otherwise shall constitute primarily a fund for the payment of claims for loss or damage insured against; secondarily for the creation of operating funds and such reserves as may be required by law or regulations *98 of the Insurance Commissioner or as, in the judgment of the board of directions, may be reasonably required in the second operation of the business of the company. Whenever, in the opinion of the board of directors, such reserves on hand shall be reasonably sufficient for said purposes, and there shall be an excess thereof, the board of directors may order a distribution of all or any part of such excess to the members, and in making such distribution to members, same shall be made pro rata in proportion to the payments of premiums which said members shall have made to the company. In determining the amount of unabsorbed premiums existing in the reserves or surplus of the company, the board of directors may from time to time divide the policies of insurance written by the company into different classes in accordance with such basis of classification as the board may deem just and proper. Whenever a member of the company shall cease to be a member thereof, all unabsorbed premiums remaining in the company or in the different classes thereof applying to policies held and premiums paid by said retiring member shall be returned to the retiring member and all interest of the retiring member *99 in the reserves and surplus of the company shall thereupon terminate. "Section 4 - All funds of the company, over and above amounts necessary to pay the debts of the company shall and do belong to the members of the company and on dissolution of the company, the same shall be distributed to the members of the company pro rata in proportion to the payment of premiums which said members shall have made to the company." Growers Mutual was organized after discussion between J. N. Greening and L. C. Edwards, Jr. Both were members of the Pasco Packing Association. All policies of insurance actually sold by Growers Mutual were to members of that association, although some growers in the area who were not members of the Pasco Packing Association were solicited for policies. All of the policyholders, but three, were relatives or business associates. For the period ending September 1, 1945, twenty-nine policies in all were issued. No policy was issued for more than one season. The aggregate risk assumed under the policies was $760,932 and the premiums collected on such policies totaled $253,644. One of the twenty-nine policies, Policy No. 3, was issued to Dixie Groves. Of the premium of *100 $52,660 paid by Dixie Groves on the above Policy No. 3, the unabsorbed premium, under section 3 of Article VI of the by-laws, was $51,544.13. The balance sheet of Growers Mutual, as per its books, at August 31, 1945 was as follows: ASSETS
Cash in Banks: Bank of Pasco County,
Dade City, Fla.
$ 2,826.40
First National Bank,
Atlanta, Georgia
47,738.30
$ 50,564.70
U.S. Government Securities (at
cost)
200,000.00
Accrued interest on U.S. Govern-
ment Securities
437.50
Unexpired Insurance
32.00
$251,034.20
LIABILITIES
Federal income tax for year ended
Dec. 31, 1944
$ 2,536.44
Accounts Payable
200.00
Income withholding taxes payable
22.80
Accrued payroll tax
5.74
$ 2,764.98
Policyholders' reserve
248,269.22
$251,034.20
According to the corporate minutes, a special meeting of the stockholders of Dixie Groves was held at 10:00 A.M., on September 18, 1945, at Dade City. All of the stockholders of record were present, and a resolution was adopted that the board of directors be requested to liquidate the affairs of the company by conveying, transferring or assigning all the property and assets of the company *101 to the stockholders in undivided interests in proportion to the amount of their stock ownership, subject to the payment of a note to Pasco Packing Association in the sum of $89,362.51, to be assumed by the stockholders, and upon the completion of such liquidation, that the company be dissolved. According to the minutes of Dixie Groves' board of directors, a meeting of the board was held at the office of the company at Dade City at 11:00 A.M., on September 18, 1945. The directors present were H. S. Massey, C. H. Edwards and M. E. Price. The minutes recited the action of the stockholders of the company to liquidate and dissolve the company, and a resolution was adopted authorizing the executive officers to proceed with the liquidation of the affairs of the company and the transfer of the corporate assets in accordance with the resolution previously adopted by the stockholders. A further resolution was adopted ordering and directing the president, secretary and executive officers "to execute and file the necessary certificate or certificates to carry out said purpose of dissolution, provided, however, that no such dissolution shall be effected until the liquidation just approved be *102 carried into effect." Pursuant to the above action of its stockholders and directors, Dixie Groves transferred all of its assets to its stockholders, Triple E. Development Company, Louise H. Edwards, W. F. Edwards, Katherine T. Edwards, L. C. Edwards, Jr., and M. E. Price. The transfer of the realty was effected by three deeds, dated September 19, 1945. All other assets were transferred by a fourth instrument, also dated September 19, 1945. After Dixie Groves transferred its assets, as indicated, it ceased to operate and carried on no further business. In the liquidation of Dixie Groves, its stockholders (petitioner transferees herein), upon surrender of their stock, received assets with fair market values as follows: Fair
Market
value
Name of
of assets
Stockholder
received
Triple E Development Company
$133,911.27
W. F. Edwards
66,955.63
Katherine T. Edwards
66,955.63
L. C. Edwards, Jr.
66,955.63
Louise H. Edwards
66,955.63
M. E. Price
26,782.25
Immediately after receiving the assets of Dixie Groves in liquidation, Louise H. Edwards, W. F. Edwards, Katherine T. Edwards, L. C. Edwards, Jr., and M. E. Price transferred their respective undivided *103 interests therein to Triple E Development Company for a consideration of $412,548.12. The instrument evidencing the transfer of their interests in all of the assets, except the realty, which was transferred by separate instruments, was dated September 24, 1945. After these acquisitions, Triple E entered the land and trees of the Valrico properties on its books at $11,460.49 for the land and $103,144.40 for the trees. [2]
Another of the entries made to cover the assets so acquired was an entry dated September 24, 1945, described "a/c Growers Mut. Ins. Co. - $50,000.00." Generally, in the instruments of assignment made by Dixie Groves to its stockholders, under date of September 19, 1945, and that executed by the individual stockholders to Triple E, under date of September 24, 1945, the following items were covered as being conveyed, "all notes, credits, choses in action, accounts, claims, rights of property or rights to receive property, whether the same are in possession or not and whether the same have matured or not." According to the minutes, the directors of Growers *104 Mutual held a regular meeting at 11:00 A.M., September 18, 1945, in Dade City. Present at the meeting were Grimes, Price [3] and Greening. At this meeting the corporate by-laws were amended, by striking the last sentence of section 3, Article VI, which provided that all unabsorbed premiums applying to the policies of a member should be returned to a retiring member when such member ceased to be a member, and inserting in place thereof the following: "Whenever a member of the company shall cease to be a member thereof, all unabsorbed premiums remaining in the company or in the different classes thereof applying to policies held and premiums paid by said retiring member shall be paid in five equal annual installments - the first installment being payable one year from the date of the expiration of the last policy held by the member and an equal amount each year thereafter until the total reserve credited to the member shall have been paid in full, or in lieu thereof, the reserve shall be payable by mutual agreement between the company and the member. No interest shall be payable on the reserve regardless of the manner in which the reserve is paid." *105 At the same meeting, a resolution was adopted providing that a reserve be set up on the books of the company and that all of the net earnings for the preceding fiscal year be carried into that reserve. This reserve was to be carried on the books in the names of the members according to their proportionate shares in such earnings or reserve. On a date, or dates, not shown, the Insurance Commissioner of Florida had advised J. N. Greening, president of Growers Mutual, that the company should set up a minimum reserve of $100,000. Prior to the meeting of the board of directors on September 18, 1945, no such reserve had been established or set up. Shortly after the liquidation of Dixie Groves and the sale by its individual stockholders of their undivided shares in the corporate assets to Triple E, Evans, president of Triple E, orally requested of Greening that Growers Mutual pay to Triple E the unabsorbed portion of the premium which had been paid by Dixie Groves on Policy No. 3, which policy had expired on September 1, 1945. Neither Dixie Groves nor any of its officers, directors or stockholders had made any request for the payment of such unabsorbed premium prior to the time of the *106 distribution by Dixie Groves of its assets to its stockholders. It was generally known, however, in the Pasco organization, which included the members and officers of Growers Mutual, that Dixie Groves was going out of business and that Triple E Development Company was taking over the property and business of Dixie Groves. The request made by Evans for payment of the unabsorbed premium on the Dixie Groves policy was considered by the directors of Growers Mutual at a meeting held on October 6, 1945, at which time a resolution was unanimously adopted to the effect that "due to the fact that Dixie Groves Company was now out of business, that they be paid in cash their equity in the policyholders' reserve." Among the directors of Growers Mutual participating in this meeting were Sallie E. Massey, wife of H. S. Massey, who had been president of Dixie Groves, and M. E. Price. Pursuant to the above resolution, and on the same date, October 6, 1945, a check was issued by Growers Mutual to Triple E in the amount of $45,000, as a partial payment of the unabsorbed premium on the above Dixie Groves policy. Evans or Triple E was advised that a final payment would be made as soon as the audit *107 of the affairs of Growers Mutual had been completed so as to determine the exact amount of unabsorbed premium due. A further and final payment of $6,544.13 was made on December 14, 1945, as a result of the audit. Evans thereafter transmitted to Growers Mutual, in compliance with a request of the latter, a copy of the assignment of the Dixie Groves interest to the Triple E Development Company. Early in the following year Growers Mutual made payments upon request of various of the holders of policies which had expired September 1, 1945, of the unabsorbed premiums with respect thereto. These payments were not lump-sum payments, however, but were made in installments, as provided by the by-laws as amended on September 18, 1945. Pursuant to action of the directors on December 30, 1946, payments of interests in "the policyholders' reserve" were made to four "previous policyholders" in lump sums. Under date of March 29, 1946, each of the stockholders of Dixie Groves signed a written consent for its dissolution and requested the Secretary of State to issue a certificate of dissolution thereon. This written consent, which was required under Florida law, was filed with the Secretary of State *108 on April 24, 1946. The dissolution certificate was issued on June 6, 1946. The respondent in his notices of liability herein, dated June 24, 1949, determined that Dixie Groves had additional income in the amount of $51,544.13 during the period ended November 10, 1945, and explained the adjustment as follows: "It has been determined that the reserve balance in Growers Mutual Insurance is taxable income." Shortly after Triple E acquired the Valrico property, it planted ten additional acres of citrus groves on one of the hills. This land previously had had no grove on it. Triple E was partially dissolved in 1951, to separate the interests of Evans and the Edwards brothers. In dividing the assets, "a little more acreage" of the Valrico Groves was considered the equivalent in value to other grove acreage outside the Valrico area. Of the $250,500 paid by Dixie Groves in its purchase, in 1943, of the Fugazzi and Peninsular properties, $90,000 represented the cost of the growing fruit on the trees at the time of purchase. Opinion The facts show that a substantial part of the lump-sum prices paid by Dixie Groves for the Peninsular and Fugazzi properties was paid for the purpose *109 of acquiring the crop of young fruit on the trees. It follows, we think, and we here hold that such part of the lump-sum purchase prices of the groves as was properly allocable to the growing fruit constituted cost of such fruit and is to be taken into account as cost in computing the gain realized when the fruit was later harvested and sold. Triple E Development Co., 20 T.C. - (promulgated July 17, 1953). See Watson v. Commissioner, 345 U.S. 544. The next question is as to the amount of the lump-sum purchase prices for the Peninsular and Fugazzi Groves which represented the cost of the growing fruit. Eliminating $33,466.80, which was paid in the Fugazzi transaction for machinery, equipment and other goods and chattels, the amount paid for the land, trees, buildings and fruit on the trees was $217,033.20. It is the claim of the petitioners that of that amount $50,189.92 was the cost of the land, buildings and trees and $166,843.28 was the cost of the growing crop of citrus fruit. It is the contention of the respondent that only $55,000 may properly be regarded as the cost of the growing fruit. The petitioners base their claim upon the testimony of three individuals, *110 who made appraisals of the properties for Dixie Groves, and upon the appraisals so made. The appraisals in question were dated August 16, 1943, August 20, 1943, and September 21, 1943, and while there is no indication on the face of the appraisals, as submitted, that they were for dates other than the dates they bore, the testimony of the witnesses was that they were made as of June, 1943, as of late June or July, 1943, and as of June or July, 1943. In entering the purchase of the properties on its books of account, Dixie Groves made its allocation of $50,189.02 to land, trees and buildings, and $166,843.28 to the fruit crop, by averaging the fair market values of the land, trees, buildings and fruit according to their appraisals, taking the ratios thereof to the average appraised values of the whole and applying the ratios obtained to the lump-sum purchase prices paid for the properties. The respondent rests his contention largely upon the testimony of two witnesses, who made appraisals of the properties in 1951, but as of April 28, 1943. For the 392.8 acres on which the citrus trees were located, they arrived at a fair market value of $143,434 for the land and trees. Improvements *111 were appraised at $3,750. For the excess lands of the tracts on which the groves were located, a total of 543.1 acres, they found a fair market value of $8,145, being, for all practical purposes, $15 an acre. There were three extra parcels, including lots adjacent to the railroad and depot in the town of Valrico, 24 lots in a boom-time subdivision and 57 acres, mostly wild land, for which they arrived at a fair market value of $7,500, $1,000 and $1,000, respectively. The fair market value of the fruit was determined to be $58,798. They did not appraise the machinery and equipment but accepted therefor the invoice price of $33,466.80. The total of the fair market values of the various items, as so determined, was $257,093. On the basis of the above, they allocated the $250,500, being the total cost price of the Fugazzi and Peninsular properties, to the component parts thereof, as follows: Groves (trees and land)
$140,533.20
Excess Lands, Improvements and
Extra Parcels
21,500.00
Machinery and Equipment
33,466.80
Young Fruit Crop
55,000.00
$250,500.00
Shortly prior to the trial herein, and as of June 15 to June 22, 1943, the dates of conveyance of the Fugazzi *112 and Peninsular properties to Dixie Groves, these appraisers also made a determination of the fair market value of the properties and an allocation of the cost of the properties to Dixie Groves to the component parts of the properties on the basis of such determination. They concluded that the fair market value of the groves (land and trees), excess and extra parcels of land, improvements, and machinery and equipment was substantially the same as their market value at April 28. The fruit crop they appraised at $99,909, as compared with $58,798 at April 28. Treating these appraised values at June 15 to June 22 as the basis for arriving at the cost to Dixie Groves of the component parts of the properties purchased, they allocated the total purchase price of $250,500 as follows: Groves (land and trees)
$120,333
Excess Lands, Improvements and Extra
Parcels
18,283
Machinery and Equipment
28,064
Fruit Crop
83,820
$250,500
There was apparent agreement between the parties herein and their witnesses that the Peninsular and Fugazzi Groves are located in what is commonly referred to as a "cold spot" and are in a category often denominated as "cold groves," and further, *113 that the hazard most dreaded by citrus growers is frost or freezing temperatures. Other agreed hazards include drought, hurricane and hail. The witnesses were in agreement that many trees in these groves had been damaged by freezes in 1917, 1934 and 1940, but there was considerable difference between them as to the extent of the damage. They were also agreed that there had been an early and heavy bloom in 1943 and that by the end of April a good crop of fruit was set on the trees, and, absent serious damage by one or more of the hazards mentioned, there should be a substantial realization on the crop when it matured and was sold. In contrast with the above, however, there was wide divergence between the witnesses as to the fair market value of the fruit and of the grove properties without the fruit. For the land alone, the average of the fair market values as determined by petitioners' witnesses was $4,833.33, which would be $5.16 an acre for the entire 935.9 acres, or $12.30 an acre, if applied only to the 392.8 acres on which the trees were located, which is in contrast with $15 an acre determined by respondent's appraisers as the fair market value of the 543.1 acres of excess *114 or bare land on which there were no citrus groves. For the land and trees combined, the average of the fair market values determined by petitioners' witnesses was $37,833.33, which would be $40.42 an acre for the whole acreage, or $96.32 an acre for the land on which the trees were located, with nothing for the excess land. These figures are in contrast with the opinion of respondent's appraisers of a fair market value of $143,434, or $365.15 an acre, for the 392.8 acres of the land with the trees, and $17,645 for the 543.1 acres of excess land and the extra parcels of land, as shown above. In contrast, also, were the $12,500, representing the average of the fair market values for the improvements as determined by petitioners' appraisers, and the $3,750, found therefor by the appraisers for the respondent. For the fruit crop, the respondent's appraisers based their appraisals on an ultimate production of 18,270 boxes of early and mid-season oranges, 39,230 boxes of Valencias, or a total of 57,500 boxes of oranges, 91,000 boxes of grapefruit and 500 boxes of tangerines, or a total of 149,000 boxes of fruit in all. By comparison, the actual production was 55,680 boxes of oranges, 90,618 *115 boxes of grapefruit and 4,094 boxes [4] denominated packing house fruit, or a total of 150,392 boxes. [5] The appraisers then applied the current price being received for the 1942-1943 citrus crop as of the appraisal date, arriving at an estimated return at maturity for the growing crop then on the trees of $190,410. They then applied what they regarded as the percentage of maturity of the growing crop at May 1, 1943, arriving at their estimated fair market value on that date of $58,798. They made no discount for possible loss of the crop due to the hazards of cold, drought, etc., listed above. They regarded their failure to make such discount as an adequate offset for using the current prices for the fruit, rather than an estimated prospective price for the 1943-1944 crop, which conditions then existing indicated would be higher than the current 1942-1943 prices. In determining the percentages to be applied for the purpose of arriving at the percentage of maturity for the growing crop at the appraisal date, they followed what is known as the Zack Savage formula. By that formula, a crop is regarded as being mature in any given month in the same ratio that the cost of bringing the crop *116 to the state of maturity in that month bears to the total cost of producing the crop up to the time of harves. Here the appraisers used the percentages of maturity figures as of May 1 so as to give the fruit crop the benefit of its growth for the full month of April. The formula was originated in 1947, by Zack Savage, Associate Agricultural Economist, Agricultural Extension Service, University of Florida, and although it is an arbitrary mathematical formula, it is rather commonly used in the citrus producing field in the state of Florida. The increased value determined by the appraisers of $99,909 for the fruit crop at June 15 to June 22 was also arrived at by the use of the Zack Savage formula. In the case of two of the petitioners' appraisers, it is difficult to make much of their testimony other than the lump-sum conclusions stated in their *117 written reports. In many respects, they did not know why they arrived at certain conclusions, or had failed to refresh their recollections before coming to the witness stand. Altogether too often, the response was that they had made the appraisals many years before and did not remember; or that they had some notes, but did not have them present in the courtroom. In other respects, there was wide variance in their testimony as to basic or background facts. The witness who submitted his report under date of September 21, 1943, and who testified that he made his appraisal as of June or July, testified that the fruit at the time of his appraisal was made was about one inch in diameter for the oranges, and about three inches in diameter for the grapefruit. The witness who submitted his appraisal under date of August 20, 1943, and who testified that his appraisal was made in or about June or July, stated that the oranges at that time were about the size of the eraser in a pencil and that the grapefruit was about half as large as a golf ball. The first of these witnesses, who had appraised the fruit crop as having a fair market value of $170,000 as of June or July, after stating that the *118 value so arrived at was "the fair market price of what I found the fruit would sell for net for the season," stated that he had made some discount for the freezing hazard, but could not recall just what consideration was given to that hazard. The other witness, who testified to a fair market value of the fruit as of late June or July, of $167,000, could not remember whether he made any allowance for loss or damage due to the hazards which might be encountered, including cold weather, but thought he must have done so since he was a "perishable" man. The first of these witnesses testified that, according to his recollection, he had estimated the fruit crop at around 50,000 boxes of oranges and 15,000 to 20,000 boxes of grapefruit, and probably 3,000 or 4,000 boxes of tangerines. Being questioned further, he thought that the grapefruit estimate might have been 10,000 or 15,000 boxes. This was as against an actual harvest of 90,618 boxes [6] of grapefruit from the crop on the trees and a production of 36,680 boxes of grapefruit for the 1942-1943 season. This witness also testified that, on an average, "good bearing groves" in Florida were selling, in 1943, for prices ranging from $1,000 *119 to $1,500 an acre without the crop. The second witness referred to testified that grove prices in Florida at that time ranged from $200 to $650 an acre. In a breakdown of those figures, he placed Valencias on high ground in the $600 class; grapefruit, on good ground, in the $200 class; and seedling orange groves at about $350. He regarded $200 as the maximum price for a cold grove. It was not clear from his testimony whether these prices were with or without the crop. Petitioners' third appraiser witness did not regard the grove properties as merchantable, except for the fruit. This was because he regarded the groves as "cold groves," there was evidence of cold damage to trees in the groves, and it was his understanding from hearsay that the groves had been unprofitable operations after freezes. He agreed, on cross-examination, however, that there was every indication at the time of his inspection in 1943 that the groves had not been damaged by cold for several years. He appraised the fruit crop as of June, 1943, at $165,000, and stated in his report that he "would be glad to *120 buy the crop of fruit now on the trees at the appraisal figure which I have fixed for it and would expect to make a profit on such a deal." It was brought out on cross-examination, however, that he would be willing to buy the crop only under the contract form regularly used by him, whereby the seller would have had to bear the risk of damage by cold, "excess scale, and so forth," in bringing the crop to maturity and that in the absence of such a provision in the contract, he would not have been willing to buy a box of the fruit. As for grove prices at that time, he really didn't remember, but thought they were pretty cheap. Just to give an opinion, he thought they were selling for from two to three to eight hundred dollars an acre. It is the claim of the petitioners that the allocation of the lump-sum purchase prices to the component parts of the properties should be based on the state and condition of the groves and the fruit as they existed in the middle of June, 1943, since it was on June 15 and June 22 that the conveyances were made and title to the properties passed to Dixie Groves. It was very likely, we think, that it was on that theory that Dixie Groves had had appraisals *121 made as of June or as of June or July. In making the argument, petitioners confuse the question to be decided. The question here is not when title to the properties passed to Dixie Groves, nor when all of the steps in the transaction were completed, but is what amount constituted the cost to Dixie Groves of the fruit crop. It was for the groves and the fruit crop as they stood at April 28, 1943, that the prices were negotiated and fixed, and it was to assure their purchase on such terms that Edwards executed the purchase agreements on that date. At June 15 and 22, the crop had advanced by nearly two months more of growth and had withstood the possible or probable hazards up to those dates. One such possible hazard was a spring drought, which sometimes seriously damages young fruit, causing it to drop from the trees. It is true that petitioners' witnesses generally expressed the view that there was not much difference in the fruit at June 1 and the end of April. Their appraisals were not as of June 1, however, and the first of these witnesses who had made his appraisal as of June or July, testified that normally he would not pay as much for a crop in April as in July because of the *122 hazards that might be encountered and at the later date "you would just be two or three months closer home to harvesting these crops." The views of respondent's witnesses, to the effect that the crop was worth substantially more at June 12 and June 22, than at April 28, have already been set out above. On the record here, we are unwilling to assume that the sellers of the groves would have sold and Dixie Groves could have bought the groves with the fruit thereon at the state of growth and maturity which had been attained by the fruit on June 15 and 22 at a price as favorable to the purchaser as that which had been negotiated and agreed to in April. To the contrary, the evidence persuades us that such would not have been the case. From the evidence of record, documentary as well as the testimony of witnesses, we are convinced that Dixie Groves, in the allocation of the lump-sum purchase prices of the instant properties to the component parts thereof made on the basis of the values arrived at by its appraisers, attributed altogether too much to the fruit crop and too little to the land and trees, while the respondent's appraisers, in their valuation of the properties and allocation *123 of the lump-sum purchase prices, have attributed too much to the land and trees and not enough to the fruit crop. The petitioners' witnesses were influenced, to some degree, we think, in their placing of very little value on the land and trees by preconceived ideas of the particular properties and by the fact that they personally would not have been interested in buying cold groves for their own account. One admitted that there were good-looking trees in the groves, but that they were not trees "that I liked." Another rather plainly indicated that he "just didn't want any groves" of that character and did not think they were worth much. There is little indication that they made, or attempted to make, any substantial inquiry as to the market at the time for such groves. That there was an active market for bearing citrus groves in 1943, cold or otherwise, and that it was improving is, we think, clearly established of record. It was the testimony of one of respondent's witnesses that there were buyers at the time who made a point of seeking out cold groves and made money on them. It is true that many of the trees in the instant groves had been damaged by cold weather at one time or *124 another, and there were areas where trees which had been killed had been bulldozed out and the land was no longer utilized for citrus grove purposes. On the other hand, an actual count of trees in the groves disclosed that the owners had apparently thought well enough of the possibilities to plant 4,038 Valencia orange trees, which in 1943 were about four years old. While from an over-all standpoint the groves were in a basin, they were not on the basin floor, and though many of the trees had been cut back, there likewise were many which had not been damaged by the cold weather and, as indicated above from the testimony of one of petitioners' witnesses, there was every indication at the time of his inspection in 1943 that the trees then in the groves had not been damaged by cold for several years. The record also discloses that petitioners' witnesses had based their appraisals of the trees on an estimated tree count of 23,550, whereas a subsequent actual tree count indicated that there were 27,945 trees in the groves in 1943, 4,038 of which were the young Valencia trees previously mentioned. The remaining 23,907 trees were from seven to forty-two years of age in 1943, most of them *125 being between seven and twenty-two years old. It is thus apparent that 23,907 of the trees had not only survived the cold temperatures experienced in the cold spot where they were located, but had so recovered that they were capable of producing fine crops of fruit. Taking the above factors bearing upon the value of the land and trees as of April, 1943, into account requires, in our opinion, an allocation of a substantially greater portion of the lump-sum purchase prices of the properties as the cost of the land and trees and a correspondingly lesser amount as the cost of the fruit crop than the portions allocated by Dixie Groves on its books and as contended for by the petitioners here. With respect to the fruit crop, a further fact is noted. The respondent in his determination allowed the deduction of $27,764.75 claimed by Dixie Groves as grove care to August 31, 1943, and while there is no breakdown as to just when these costs were incurred, we do know that the Dixie Groves appraisers did not take into account such part thereof as might have been incurred prior to thedates as of which their appraisals were made. In other words, they appraised the fruit crop as of June or June *126 or July when the grove care expenditures prior thereto would have to be reflected in the fruit. Otherwise the petitioners would be getting a double benefit from the same expenditures. While we are convinced that in making their appraisals the respondent's appraisers earnestly endeavored to place themselves back in April and June of 1943, we are persuaded by the over-all evidence that, as stated above, they have attributed too much of the lump-sum purchase prices of the groves to land and trees and not enough to the fruit crop. They made their appraisals in retrospect, some eight years after the year of purchase, and at the time of their inspection of the properties they were viewing trees that had had eight additional and favorable years to improve from such cold damage as had been previously sustained, making it that much more difficult to visualize the trees as they actually were in 1943. Furthermore, the formula used by them for determining the state of growth of the fruit crop was admittedly arbitrary, and it is our conclusion that the results of its application did not adequately reflect the crop of fruit on the trees at April 28, 1943. The facts show that the bloom for that *127 year had not only been quite heavy, but it had been an early bloom and that a heavier crop than usual had set on the trees and was farther advanced than might normally be expected. And whatever the allowance which should have been made by the appraisers for possible damage from the hazards of drought, cold and the like, the market prospects as they could be anticipated at the end of April, 1943, called for a substantially higher ultimate price for the crop on the trees than was being currently received for the 1942-1943 crop. Such being the state of the record, and having examined, studied and considered the evidence bearing thereon, we have concluded and found that the cost to Dixie Groves of the fruit crop on the Peninsular and Fugazzi Groves was $90,000. At the conclusion of the trial herein, the petitioners moved to amend their petitions, to allege that the respondent erred in that he determined that Dixie Groves' taxable period beginning September 1, 1943, ended on November 10, 1945, rather than on June 6, 1946, when the corporation was dissolved. Preliminary to the motion, counsel for the petitioners stated that he had learned that the date of dissolution for Dixie Groves *128 was June 6, 1946, subsequent to his preparation and filing of the petitions herein. As nearly as could be understood from the explanation of counsel, the amendment was for the purpose of showing a longer taxable period beginning September 1, 1945, which, in turn, might result in an excess profits tax advantage to Dixie Groves. The motion not having been opposed by respondent, was granted and the respondent, in due course, filed his answer to the amendment to the petitions, denying error. On brief, the petitioners now argue that the respondent has determined a deficiency against Dixie Groves for a period other than a proper taxable period and has made no determination for a proper period, with the result that this Court is without jurisdiction over any period beginning September 1, 1945. The facts show that Dixie Groves' final taxable period began on September 1, 1945; that it transacted no business and had no operations after September 19, 1945, when, in liquidation, it conveyed and transferred all of its properties to its stockholders; that its corporate existence was continued until June 6, 1946, when it was finally dissolved; that a return styled as being for the fiscal year ended *129 August 31, 1946, but intended as the return for Dixie Groves' final taxable period, was delinquently filed on November 14, 1947; that on the return a net loss of $8,124.15 was claimed; and that the notice of deficiency, even though stated to be for the period September 1, 1945 to November 10, 1945, is based on the delinquent return and, as in Harvey Coal Corporation, 12 T.C. 596, "covered the entire period of the taxpayer's operations" for its final taxable period. It further appears that prior to the filing of the instant amendment to the petitions and the making by the petitioners of the jurisdictional argument here under consideration, the parties considered and regarded the determination as covering the final taxable period of Dixie Groves. In our opinion, the facts in this case bring it wholly within the ruling in Commissioner v. Forest Glen Creamery, Inc., 98 Fed. (2d) 968, certiorari denied, 306 U.S. 639, and in Harvey Coal Corporation, supra.We accordingly conclude and hold that the notice of deficiency was a proper notice and that we are not without jurisdiction, as the petitioners now contend. Cf. Columbia River Orchards, Inc., 15 T.C. 253. *130 The remaining question is whether the $51,544.13, being the unabsorbed portion of the premium paid by Dixie Groves to Growers Mutual for the year ended August 31, 1945, was an accrued item and therefore income to Dixie Groves for its final taxable period beginning September 1, 1945, or was an indeterminate claim until after Dixie Groves had concluded all of its operations and had distributed its assets to its stockholders on September 19, 1945, pursuant to action taken at the stockholders' and directors' meetings the previous day. Dixie Groves kept its books and filed its returns on an accrual basis and the petitioners do not contend that the amount in question was not income if it was an accrued item prior to the distribution by Dixie Groves of its assets to its stockholders. The petitioners rely to a substantial extent upon the facts that on the same day that Dixie Groves' stockholders and directors directed its liquidation and dissolution, the directors of Growers Mutual adopted a resolution providing that the net earnings of the company for the preceding year be carried into a reserve, to be set up on the books, which reserve was to be carried in the names of the members according *131 to their propertionate shares in such earnings, and further amended the by-laws, to strike the last sentence of section 3 of Article VI, which provided that all unabsorbed premiums should be returned to a retiring member, and substitute therefor a provision that the unabsorbed premiums of a retiring member be paid in five equal annual installments, the first installment being payable one year from the date of the expiration of the last policy of such member; and upon the further fact that no demand was made by any one upon Growers Mutual for Dixie Groves' unabsorbed premium until the demand by Evans, president of Triple E, after Triple E, as a stockholder in liquidation of Dixie Groves and by purchase, had acquired Dixie Groves' assets. It is our opinion that the position of the petitioners is not well taken. The insurance year for which the premium had been paid expired on September 1, 1945, and the facts supplying the basis for computing the unabsorbed premium were fixed and determined and there is no showing or contention that there were any claims remaining under the policies which were in dispute or yet to be determined. The parties in interest were all members of the Pasco *132 Packing Association and it was generally known in that group, which included the members and officers of Growers Mutual, that Dixie Groves was going out of business and that Triple E Development Company was taking over its properties and business. The facts further show that, even though the directors of Growers Mutual, on the same date that Dixie Groves voted to liquidate and dissolve, had adopted a resolution carrying its earnings of the preceding year into a reserve and had amended its by-laws to provide for the payment to withdrawing members of their interest in the reserve over a period of five years, that procedure was not followed in paying Dixie Groves' unabsorbed premium to Triple E and that the full amount was paid as soon as the audit of the affairs of Growers Mutual had been completed. On the facts here present, we conclude and hold that the unabsorbed premium of $51,544.13 had accrued prior to the liquidation of Dixie Groves, and was income to it in its taxable period beginning September 1, 1945. The parties have stipulated that the petitioners are liable, under section 311 of the Internal Revenue Code, at law and in equity, for the periods herein *133 as transferees of the assets of Dixie Groves Company, but that such liabilities are limited to the fair market value of the assets received by each in the liquidation of Dixie Groves, as set forth in the said stipulation and shown in our findings of fact. Decisions will be entered under Rule 50. Footnotes
1. Following are the "et al." proceedings covered herein: Triple E. Development Company, Docket No. 24910; W. F. Edwards, Docket No. 24911; Katherine T. Edwards, Docket No. 24912; L. C. Edwards, Jr., Docket No. 24913; and M. E. Price, Docket No. 24914.↩
2. L. C. Edwards, Jr., thought these figures were based on an appraisal of the properties at the time.↩
3. The only person of the name Price shown of record to have been a director of Growers Mutual was M. E. Price who at the same date and hour was shown by Dixie Groves to have been attending a meeting of the board of directors of that corporation.↩
4. Not knowing the breakdown of this 4,094 boxes of "packing house fruit," the respondent's appraisers treated most of it as oranges, thereby giving the petitioners the benefit of the higher value of oranges over grapefruit. ↩
5. This amount includes the production from the Altman Grove, as well as the Fugazzi and Peninsular properties.↩
6. This production figure may have included some small quantity of grapefruit from the Altman tract.↩