WINTER & COMPANY, INC. (INDIANA), PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 15204. Promulgated July 19, 1949.

*David Sher, Esq.*, and *B. E. Brandes*, Esq., for the petitioner.
*John J. Madden, Esq.*, for the respondent.

114

OPINION.

HILL, *Judge*: The questions for determination as stated at the beginning of this report will be taken up in the order stated. The first question is, Did petitioner have an unused excess profits credit for its fiscal year ended January 31, 1943?

If it had such credit it is entitled under section 710 (c) (3) (A) of the Internal Revenue Code[1] to carry it back to its tax year 1942. Petitioner contends that it had such credit in the amount of $19,252.32.

Respondent contends that, because petitioner had disposed of its assets and ceased all operations before May 1, 1942, and earned no income after that date, its tax year is not its fiscal year ended January 31, 1943, but is the short period from February 1 to April 30, 1942, in-

---

[1] SEC. 710. IMPOSITION OF TAX.

\* \* \* \* \* \* \*

(c) UNUSED EXCESS PROFITS CREDIT ADJUSTMENT.—

\* \* \* \* \* \* \*

(3) AMOUNT OF UNUSED EXCESS PROFITS CREDIT CARRY-BACK AND CARRY-OVER.—

(A) Unused Excess Profits Credit Carry-back.—If for any taxable year beginning after December 31, 1941, the taxpayer has an unused excess profits credit, such unused excess profits credit shall be an unused excess profits credit carry-back for each of the two preceding taxable years, except that the carry-back in the case of the first preceding taxable year shall be the excess, if any, of the amount of such unused excess profits credit over the adjusted excess profits net income for the second preceding taxable year computed for such taxable year (i) by determining the unused excess profits credit adjustment without regard to such unused excess profits credit, and (ii) without the deduction of the specific exemption provided in subsection (b) (1).

clusive. Respondent further contends that, because, as he claims, the tax year was a period less than twelve months, the excess profits net income for the short period should be annualized and the excess profits credit of $26,370.48 applied to the annualized income. Petitioner opposes annualization. If petitioner's contention should be sustained it will have a carry-back to its tax year ended January 31, 1942, of $19,252.32. If respondent's contention should be sustained, there will be no unused excess profits credit for petitioner's fiscal year 1943 and hence no such credit to carry back to its fiscal year 1942.

The statutory provision relied on by respondent in support of his contention for annualization is section 711 (a) (3) (A) of the code.[2]

The solution of the first question depends on whether the period beginning February 1, 1942, and ending April 30, 1942, was petitioner's tax year instead of the fiscal year beginning February 1, 1942, and ending January 31, 1943.

It is our conception that the obvious purpose of the provisions for the carry-over and carry-back of unused excess profits credit from a current tax year is to establish a maximum cycle of five years over which to level off the income for excess profits tax purposes as between the more profitable and the less profitable operations of the respective years composing the cycle. The effectuation of the provisions for tax relief purposes and the prevention of its abuse for tax avoidance beyond the relief intended require of necessity that the period of tax years over which the carry-over or carry-back can be made shall embrace only a period of business operations or of operations to effect a conversion or liquidation thereof.

If and when, within such authorized maximum cycle, a corporation destroys its potentiality for the production of income by disposing of its capital, inventories, and assets, and ceases operations, goes out of business, and, consequently, ceases to produce income, its cycle for the carry-over and carry-back of unused excess profits credit thereupon terminates. In respect of the excess profits credit, the period following cessation of operations under such circumstances is not a tax period and it therefore ceases to be a constituent part of the cycle within which a carry-over and carry-back of an unused excess profits credit is provided.

---

[2] SEC. 711. EXCESS PROFITS NET INCOME.

  (a) TAXABLE YEARS BEGINNING AFTER DECEMBER 31, 1939.—

  *　　*　　*　　*　　*　　*　　*

  (3) TAXABLE YEARS LESS THAN TWELVE MONTHS.—

  (A) General Rule.—If the taxable year is a period of less than twelve months the excess profits net income for such taxable year (referred to in this paragraph as the "short taxable year") shall be placed on an annual basis by multiplying the amount thereof by the number of days in the twelve months ending with the close of the short taxable year and dividing by the number of days in the short taxable year. The tax shall be such part of the tax computed on such annual basis as the number of days in the short taxable year is of the number of days in the twelve months ending with the close of the short taxable year.

This case presents a unique factual situation. Petitioner was a corporate entity, but in practical effect was operated as a department of its parent, the New York company. Petitioner assembled pianos from constituent parts supplied and shipped to it by its parent. Petitioner's inventories so supplied were charged to it on the parent's books. The pianos assembled by petitioner were sold as its parent's pianos to the latter's customers. The sales accounts were held and collected by the parent and credited on its books to petitioner. From the proceeds of the collections the parent advanced to petitioner such amounts as were required by the latter to carry on its operations and charged petitioner therewith. The parent retained in its custody the balance thereof. Petitioner's books of account were kept by the parent at the offices of the latter in New York. The same persons kept and audited the books of the parent and of petitioner. Except for cash advanced by the parent to petitioner to carry on the latter's operations, no moneys were transmitted from the parent to petitioner or vice versa. The intercompany accounts were settled by bookkeeping entries of offsetting credits and debits.

When it was determined, on or about February 19, 1942, that petitioner should cease operations, such pianos as petitioner had complete parts for in inventory were assembled, sold, and distributed to the parent company's customers and its remaining inventories and plant equipment were shipped to the parent in New York and credited on the latter's books to petitioner. There remained in petitioner's possession no other tangible property. Petitioner's intangible property consisted of credit entries on the parent's books.

The foregoing statement as to intangible property does not include petitioner's claim for refund. Whether such claim has substance as property is the ultimate issue for determination.

It is obvious that a distribution of petitioner's intangible property to its parent was available at any time to the parent, and at the latter's behest, by mere book entries, and that without formal distribution the parent used the funds represented by the book credits above mentioned.

It is apparent that the course of petitioner's action and function as a corporate entity was and is entirely dictated and controlled by its parent to subserve the latter's convenience and economic interests and that petitioner, notwithstanding its recognition as a corporate entity, can not independently formulate or execute for itself any functional program.

Petitioner was not dissolved and its charter has been kept alive, but since April 30, 1942, it has been a mere empty corporate shell, not for any present or current purpose, but for a contingent future purpose of petitioner's parent. Since April 30, 1942, petitioner has not been a

functioning corporation. As of that date petitioner was stripped of its plant, equipment, and financial structure. It was reduced to a state of complete inertia and its charter was folded up and laid away. Whether or not petitioner will ever be recapitalized, refinanced, reinventoried, reequipped and again put in operation depends entirely upon the decision of its parent. That decision has not been made. Many years have now elapsed since petitioner was laid to rest and no action has been taken to reanimate it.

Since April 30, 1942, petitioner has had no operations, no earnings, no income, and no expense except its franchise tax. In short, no period from and after April 30, 1942, has been a tax year or part of a tax year of petitioner within the meaning of the applicable statutory provisions respecting the carry-over or carry-back of unused excess profits credit.

As above indicated, the purpose of the statutory provision for the carry-over and carry-back of an unused excess profits credit is to level the burden of excess-profits taxes over a period of not exceeding five consecutive tax years of a going concern. If a corporation to which the provision for such credit is applicable should discontinue its operating functions after the lapse of a month, a year, or two years, within such applicable period, we think it inconceivable that Congress intended that the excess profits credit was to apply not only to the operating years, but also to each of the remaining nonoperating years of the maximum authorized cycle. For if there is no production there can be no excess profits income, potential or actual, and, hence, no occasion for the authorization of an excess profits credit. It follows that if, under the situation stated, no excess profits credit is allowable, there could be no excess profits credit to carry back.

In the above expression of our views we are not unmindful of the following court decisions: *United States* v. *Kingman*, 170 Fed. (2d) 408; *Union Bus Terminal, Inc.*, 12 T. C. 197; *Allegheny Broadcasting Corporation*, 12 T. C. 522; *Mesaba-Cliffs Mining Co.* v. *Commissioner*, 174 Fed. (2d) 857; *Wier Long Leaf Lumber Co.* v. *Commissioner*, 173 Fed. (2d) 549.

An examination of the listed cases discloses that the decision in each deals with a regularly operating corporation whose unused excess profits credit was sought to be carried over, as in the *Mesaba* case, or a corporation whose functioning as such had continued pending liquidation in the year from which it was sought to carry back unused excess profits credit. The *Mesaba* case is obviously not a precedent for the decision here.

The *Kingman* case is distinguishable on its facts from the instant case. In that case, as here, there was involved the question of a short taxable year and the annualization of excess profits income against

which to apply the excess profits credit. On April 3 of its calendar tax year 1943 the Kingman corporation, pursuant to a plan of liquidation, distributed to its sole stockholder all of its physical operating assets. Thereafter it engaged in no activities or operations other than as hereinafter stated. The corporation retained its claims against the Government for refund of income and excess profits taxes, including its proposed claim under section 722 and its right to post-war refund of excess profits taxes. The latter item consisted of nonnegotiable bonds evidencing its right to the postwar refund of excess profits taxes. Application was filed with the collector of internal revenue on September 10, 1943, for refund of excess profits tax for the year 1942 under the provisions of section 722. That claim was pending during the remainder of the calendar year 1943. The corporation's 1942 excess profits tax return, after adjustments, showed that it was entitled to a postwar refund credit of $2,586.08. Its return for the year 1943, after adjustments, showed that it was entitled to a postwar refund credit of $1,305.95. The original returns prior to adjustment showed a postwar refund credit of $2,267.90 for 1942 and $598.42 for the year 1943. Under the law as it then stood the taxpayer would be entitled to receive the correct amount of its postwar refund credit only after termination of the war. On or about April 30, 1945, the Kingman corporation received income by way of interest on overassessments of tax for 1942 and on or about January 29, 1946, it received income in the amount of $98.94 as interest on overassessment of income tax for the year 1943. It also received from the United States in years subsequent to 1943 the postwar refunds hereinabove referred to. The Kingman corporation retained its corporate existence throughout the years mentioned for the purpose of prosecuting the claims above enumerated.

A deficiency in excess profits tax was determined against the corporation on the theory and contention that the period January 1 to and including April 3, 1943, was a taxable year of less than 12 months, on the basis of which the Commissioner annualized the corporation's income for the purpose of applying thereto the excess profits credits for the calendar year 1943.

In the instant case petitioner received no income after April 30, 1942, and had no claim for refund under section 722 and had no bonds evidencing its right to a postwar refund of excess profits taxes. In the instant case the corporate existence was not retained for any of the purposes for which the corporate existence was retained in the *Kingman* case or for any current purpose.

In the instant case the claim for refund filed April 14, 1945, is based on petitioner's claim of right to carry back unused excess profits credits and a net operating loss from a period in which it had no operation or income.

On the facts in the *Kingman* case as above summarized, both the Federal District Court and the U. S. Court of Appeals for the Fifth Circuit held that the action of the Commissioner in determining a short taxable year and in annualizing the income thereof was error. By reason of the distinction in the facts between the *Kingman* case and the instant case, the decision in the former is not a precedent for a decision in the latter.

The *Wier* case involved the question of whether the taxpayer there was entitled to carry back to the year 1942 an unused excess profits credit for each of the years 1943 and 1944. The Wier corporation began liquidation in 1942 and continued in liquidation throughout 1943 and 1944. It retained its corporate existence beyond the period of those years.

The Court of Appeals for the Fifth Circuit held that at the end of 1943 the process of liquidation had reached a stage where there was no occasion to delay formal dissolution of the corporation and also held that at the end of 1943 the corporation was *de facto* dissolved. Accordingly that court held that the Wier corporation was entitled to carry back to 1942 an unused excess profits credit for 1943, but that it was not entitled to carry back such credit for the year 1944.

The Court of Appeals, in its decision in the *Wier* case, said:

We find ourselves in equal disagreement with the petitioner's broad position, that the facts and circumstances of, and the stage reached in, liquidation are without significance, and that the only relevant inquiry in a case of this kind is whether the corporation is a corporation still if only in name and form.

We find ourselves, however, in general agreement with the view of the Commissioner that the fact of liquidation and the particular circumstances and stages of it are relevant to the inquiry here, and that they may, indeed must, be inquired into.

We agree with him, too, that if it appears that the corporation is a corporation in name and semblance only, without corporate substance and serving no real corporate purpose, it must, though not formally dissolved, be treated as dissolved de facto.

The above quoted excerpt from the *Wier* case is authority for our holding on the facts in the instant case that, notwithstanding the petitioner here retained its legal existence, it was, for the purpose of excess profits taxes, *de facto* dissolved as of April 30, 1942, and that the period February 1 to April 30, 1942, inclusive, was a short taxable year. The quoted excerpt is also authority for our holding that there can be no carry-back to 1942 of the unused excess profits credit for the year 1944.

Because of the dissimilarity between the facts in the instant case and those of the *Union Bus* and *Allegheny* cases, neither of those cases rules the decision here.

The essence of the factual picture here is that the operation and functions of petitioner reduced it to a mere department of its parent, which on April 30, 1942, stored petitioner's charter to await its use

if and when the parent should so decide to set up another activity, departmental or otherwise, under corporate form.

Petitioner's corporate charter was not intended to be and was not surrendered or canceled. But, notwithstanding its charter has been kept alive, all substance was drawn out of the corporate body as of or prior to April 30, 1942. Since that time, in a practical sense, petitioner has been as effectually dead as if it had been mummified.

Also, as a basis of its claimed right to carry back unused excess profits credits and a net operating loss to its fiscal year 1942, petitioner contends that it was compelled to cease operations because of War Production Board Limitation Orders L–37 and L–37–A, hereinabove described. By reason of such orders petitioner was unable to continue its operation of assembling pianos. It did not elect to convert to a permissible line of production. The gist of this contention is that, because petitioner did not voluntarily quit business, but was compelled to do so by the Government, it should be permitted, for excess profits tax purposes, to carry back and apply to its tax year 1942 an unused excess profits credit for each of the two succeeding fiscal years, 1943 and 1944. We see no merit in this contention.

Petitioner claims a net operating loss for its fiscal year 1944 and the right, under section 122 (b) (1) of the Code,[3] to carry back such loss to its tax year 1942.

No evidence was offered to establish that the deductions which petitioner claims resulted in a net operating loss in its fiscal year 1944 represented expense connected with its business operations. Moreover, it affirmatively appears from the evidence, and is so found, that petitioner owned no tangible personal property subsequent to April 30, 1942. Therefore, it does not appear from the evidence that the deducted item of $330.30 for personal property taxes in 1944 represented taxes owed by petitioner.

We hold, therefore, that within the meaning of section 710 (c) (3) (A) the period from May 1, 1942, to January 31, 1943, inclusive, and the period February 1, 1943, to January 31, 1944, inclusive, are not includible in petitioner's cycle of tax years for the carry-back of unused excess profits credit.

We hold, further, that within the meaning of section 711 (a) (3) (A) the period February 1 to April 30, 1942, inclusive, is, for the

---

[3] SEC. 122. NET OPERATING LOSS DEDUCTION.

\* \* \* \* \* \* \*

(b) AMOUNT OF CARRY-BACK AND CARRY-OVER.—

(1) NET OPERATING LOSS CARRY-BACK.—If for any taxable year beginning after December 31, 1941, the taxpayer has a net operating loss, such net operating loss shall be a net operating loss carry-back for each of the two preceding taxable years, except that the carry-back in the case of the first preceding taxable year shall be the excess, if any, of the amount of such net operating loss over the net income for the second preceding taxable year computed (A) with the exceptions, additions, and limitations provided in subsection (d) (1), (2), (4), and (6), and (B) by determining the net operating loss deduction for such second preceding taxable year without regard to such net operating loss.

purpose of this proceeding, a taxable year of less than twelve months, or a "short taxable year" and, accordingly, the excess profits net income for that taxable year should be annualized. *Riteway Products, Inc.,* 12 T. C. 475; *Kamin Chevrolet Co.,* 3 T. C. 1076.

We also hold that, in addition to the reason that there was a lack of evidence to establish the loss claimed as a net operating loss, since petitioner was not engaged in a business or other operation after April 30, 1942, it could not have had an operating loss for a tax year subsequent to that date. Accordingly, there can be no carry-back of a net operating loss from petitioner's fiscal tax year 1944 to its fiscal tax year 1942.

Reviewed by the Court.

*Decision will be entered for respondent.*

LEECH, *J.*, dissents.

