AMERICAN WELL AND PROSPECTING COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 42958. Filed December 21, 1954.

504

*George G. Tyler, Esq.*, for the petitioner.
*John J. Hopkins, Esq.*, for the respondent.

OPINION.

MURDOCK, *Judge:* The Commissioner determined a deficiency of $64,047.43 in excess profits tax for the calendar year 1944. It arose from the disallowance of an unused excess profits credit carry-back from 1946.

All of the facts have been stipulated.

The petitioner, which was organized on May 13, 1931, and is a Texas corporation, filed its tax returns for the years 1944, 1945, and 1946 with the collector of internal revenue for the twelfth district of Pennsylvania.

The petitioner was engaged in the business of manufacturing and selling oil well rotary drilling equipment and accessories and of manufacturing armaments for the United States Government for a number of years prior to 1946. Bethlehem Steel Company, at all times material hereto a wholly owned subsidiary of Bethlehem Steel Corporation, acquired all of the outstanding stock of the petitioner in 1944 and has since continued to own that stock. The petitioner entered into a contract on December 19, 1945, with Bethlehem Supply Company, hereinafter referred to as Supply, which was then and still is a wholly owned subsidiary of Bethlehem Steel Corporation, for the sale of all of its transferable assets and the assumption of all of its transferable obligations and liabilities as of the opening of business on January 1, 1946.

The petitioner agreed to sell to Supply all of its real property, machinery, equipment, raw materials, goods in process or completed, contracts and leases, patents, trade-marks and trade names, cash and receivables, and all other property except certain unassignable rights and interests. The contract of sale also excluded the petitioner's corporate records and franchise and certain equipment physically located in its plant but owned by the United States Government or agencies thereof. Supply agreed to assume, pay, perform, or discharge all of the liabilities and obligations of the petitioner as of the

opening of business on January 1, 1946, and further agreed to perform for the account of the petitioner all obligations of the petitioner with respect to certain contracts and leases relating to machinery and equipment owned by the United States Government and located at the petitioner's plant. It was further agreed that if the petitioner subsequently purchased any such equipment it would, unless prohibited by its agreement with the Government, resell the same to Supply at cost.

The contract further provided that as soon after the closing date as conveniently possible Supply would pay to the petitioner for the properties to be sold an amount which would be the aggregate net book value of such properties less the aggregate book value of all the liabilities and obligations of the petitioner assumed by Supply. The petitioner also agreed that in the event any of the rights or interests or any of the obligations under any of its contracts were not assignable to Supply, it would seek to obtain any consents necessary to permit such assignments. The petitioner was required to cooperate with Supply, if such consents could not be obtained, to the end that the obligations of the petitioner should "be performed in such manner that the value and benefits of the contract in question shall be preserved and shall inure directly or indirectly to the benefit of the Supply Company."

The contract was closed on January 2, 1946, by the delivery of instruments of conveyance dated December 31, 1945, and by the assumption by Supply of all liabilities and obligations of the petitioner as of the opening of business on January 1, 1946.

Among the assets owned by the petitioner and which were covered by the agreement were the following:

Claims against the United States Government for payments in connection with the termination of a war contract which was settled in May 1946, after correspondence and negotiations, for approximately _____ $270,000.00
Claim against the United States Government for overpayment of rentals which was settled in August 1946 for approximately_____ 3,300.00
Claim against the United States Government for a refund of petitioner's 1943 excess profits tax, which claim had not been collected at the time of the hearing herein and which amounted to_____ 25,526.36

The petitioner had correspondence in 1946 and 1947 with various United States Government departments with respect to cleanup work which it was obligated to do under the terms of contracts executed in prior years. The petitioner purchased from the United States, in connection with this work, certain material and machinery owned by the Government but located on the property formerly owned by

the petitioner. The amounts necessary for such purposes were furnished by Supply and the proceeds of the sales of such material and machinery were realized by Supply. The petitioner, in October 1951, settled for approximately $1,300 a claim asserted against it by the United States Government for defective material delivered prior to January 1, 1946. The settlement negotiations with respect to the foregoing claims and the purchases and sales of the machinery and other material were conducted by persons who were officers of the petitioner and also officers of Supply, Bethlehem Steel Company, and Bethlehem Steel Corporation. These persons did not receive any compensation from the petitioner during 1946 and 1947 and were compensated by one or more of the other companies.

No entries of receipts or of disbursements were made on the petitioner's books in connection with the settlement of the foregoing claims or in connection with the purchases and sales during the years 1946 and 1947 and all receipts or payments with respect thereto were or will be realized or made by Supply. A former employee of the petitioner commenced an action in June 1946 for alleged unpaid compensation in the amount of $219,000. The petitioner filed an answer and took other action in that suit until November 1, 1948, when it was dismissed following the death of the plaintiff. The expenses of the litigation were borne partly by Supply and partly by former stockholders of the petitioner from whom the Bethlehem Steel Company had purchased the petitioner's stock.

The net proceeds of the sale of the petitioner's properties and assets amounted to $894,929 and this amount was credited to the petitioner in the intercompany bank account maintained by subsidiary companies of Bethlehem Steel Corporation. No formal action to dissolve the petitioner was ever taken by its board of directors or sole stockholder and annual meetings of both were held during 1946 and 1947 for the purpose of electing directors and officers. The balance sheets of the petitioner at the close of business on January 2, 1946, at December 31, 1946, and at December 31, 1947, were identical and were as follows:

| Assets | | Capital | |
|---|---|---|---|
| Accounts receivable (intercompany bank account) | $894,929.00 | Capital stock | $100,000.00 |
| | | Paid-in surplus | 46,513.56 |
| | | Earned surplus | 748,415.44 |
| | | | $894,929.00 |

The petitioner acquired four sections of a drydock in 1948 for approximately $800,000 and in 1949 purchased another section. The petitioner's drydock facilities represented an investment of approxi-

mately $1,500,000 at the time of the hearing, and it was in the business of renting the drydock.

The parties have stipulated that the petitioner did not have any excess profits net income for the taxable year 1946 and if the petitioner is entitled to any unused excess profits credit the amount would be $74,909.27.

The petitioner argues that it is entitled to carry back the unused excess profits credit from 1946 since no action to dissolve it had ever been taken, no liquidation distribution had ever been made, and because it was in fact still in existence and engaged in business at the time of the hearing. The petitioner further argues that its continued existence was required by the contract of sale of December 19, 1945, since it was under an obligation to cooperate with Supply in connection with the completion of the unassignable contracts and the prosecution and collection of the unassignable claims.

Existing law, at the time the Revenue Bill of 1942 was under consideration, permitted corporations to carry forward for 2 years net operating losses and unused excess profits credits. Congress recognized that such provisions were of benefit only in periods of increasing business activities and would not alleviate the suffering of corporations in periods of declining profits, especially at the close of a war economy. It was anticipated that wartime shortages and controls would greatly upset the normal cycle of the matching of taxable income against deductible expenses and that many expenses, such as those for maintenance and repairs, would be deferred to postwar years when they would not be available to offset wartime earnings. This postponement of deductible expenses to years in which the excess profits tax was not in effect would have imposed a great tax burden on corporations. The 2-year carry-back provision was adopted to afford relief in such hardship cases. S. Rept. No. 1631, 77th Cong., 2d Sess., pp. 51–52 (1942–2 C. B. 504, 546–547). It was retained for a year beyond the repeal of the excess profits tax itself in order to be sure that business had an opportunity to apply reconversion expenditures to reduce wartime taxes. S. Rept. No. 655, 79th Cong., 1st Sess., p. 19 (1945 C. B. 621, 636). Section 122 (c) of the Revenue Act of 1945, amending section 710 (c) (2) of the Internal Revenue Code of 1939, allowed corporate taxpayers to carry back to 1944 and 1945 any unused excess profits credit for 1946 as defined in section 710 (c) of the Internal Revenue Code of 1939.

The petitioner, at the beginning of 1946, disposed of the assets essential to the continued operation of the business which it had conducted with those or similar assets in 1944. Those assets were used during 1946 by Supply to carry on the business theretofore conducted

by the petitioner. The results of the operation of that business during 1946 had no effect upon the petitioner but there might have been no excess profits credit to carry back to 1944 had the petitioner continued to conduct the business during 1946. Where the business was thus transferred to another and no longer operated by the petitioner, the latter was not intended by Congress to have the excess profits credit, wholly unnecessary for 1946, carried back to offset income of a year when the petitioner had operated the business. *Winter & Co. (Indiana)*, 13 T. C. 108, appeal dismissed (C. A. 7, 1951); *Diamond A Cattle Co.*, 21 T. C. 1; *Wheeler Insulated Wire Co.*, 22 T. C. 380. Cf. *Wier Long Leaf Lumber Co.* v. *Commissioner*, 173 F. 2d 549, affirming in part and reversing in part 9 T. C. 990. It makes no difference that after several years the petitioner began to engage in a new and unrelated business.

*Decision will be entered for the respondent.*