**AMERICAN WELL & PROSPECTING COMPANY, Petitioner,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent.**

**No. 11588.**

United States Court of Appeals Third Circuit.

Argued Oct. 7, 1955.

Decided March 22, 1956.

Rehearing Denied April 18, 1956.

George G. Tyler, New York City (Cravath, Swaine & Moore, Hoyt A. Moore, Albert Rosenblum, New York City, on the brief), for petitioner.

Harry Marselli, Washington, D. C. (H. Brian Holland, Asst. Atty. Gen., Ellis N. Slack, Lee A. Jackson, L. W. Post, Sp. Assts. to the Atty. Gen., on the brief), for respondent.

Before BIGGS, Chief Judge, and MARIS and GOODRICH, Circuit Judges.

BIGGS, Chief Judge.

The taxpayer, American Well and Prospecting Company, is a Texas corporation organized in 1931. It was engaged in manufacturing and selling oil well rotary drilling equipment and accessories and in the making of armaments for the United States for a number of years prior to 1946. Bethlehem Steel Corporation acquired all of the outstanding capital stock of the taxpayer in 1944 and still holds it.

On December 19, 1945, the taxpayer entered into a contract with Bethlehem Supply Company (Supply), then and now another wholly owned subsidiary of Bethlehem Steel Corporation. Supply agreed to assume, pay and perform all of the liabilities and obligations of the taxpayer as of the opening of business on January 1, 1946, and also agreed to perform for the taxpayer all of its obligations with respect to certain contracts and leases relating to the machinery and equipment owned by the United States government. It was further agreed that, if taxpayer purchased any such equipment subsequently, it would resell the equipment to Supply at cost, unless its agreement with the United States prohibited such a course. The taxpayer agreed that it would sell to Supply all of its transferable assets, save its corporate records and franchise. Certain physical equipment owned by the United States was, of course, excluded.

The contract also provided that, as soon as possible after the closing date, Supply would pay to the taxpayer for the properties to be sold an amount equal to the aggregate net book value of the property less the aggregate book value of the liabilities and obligations of the taxpayer assumed by Supply. The taxpayer also agreed that if any of the rights or interests or any of the obligations under any of its contracts could not be assigned to Supply, the taxpayer would seek to obtain the necessary consents to permit such assignments. Under the terms of the contract the taxpayer was required to cooperate with Supply, if the necessary consents could not be obtained, to the end that the obligations of the taxpayer should "be performed in such manner that the value and benefits of the contract in question shall be preserved and shall inure directly or indirectly to the benefit of the Supply Company."

On January 2, 1946, instruments of conveyance dated December 31, 1945, were delivered by the taxpayer to Supply; and Supply assumed all liabilities and obligations of the taxpayer as of the opening of business on January 1, 1946. Among the assets owned by the taxpayer and covered by the agreement were claims against the United States. Most of these were settled in 1946. The taxpayer also had certain clean-up jobs which it was obligated to perform for the United States. In connection with these, the taxpayer purchased from the United States material and machinery owned by the government and located on the property formerly owned by the taxpayer and sold by it to Supply pursuant to the contract. The amounts necessary to effect these purchases were furnished by Supply, and Supply received the proceeds of the sale of the material and machinery. In October 1951 the taxpayer settled a claim asserted against it by the United States in the sum of $1,300 for defective material delivered prior to January 1, 1946.

Negotiations for these settlements and the purchase of machinery and supplies, hereinbefore referred to, were conducted by persons who were officers of the taxpayer but were also officers of Supply, Bethlehem Steel Company and Bethlehem Steel Corporation. These officers did not receive any compensation from the taxpayer during 1946 and 1947 but were compensated by one or more of the other companies referred to. No entries of receipts or disbursements were made on any of the taxpayer's books in connection with the settlement or the purchases and sales referred to during the year 1946. All receipts or payments in respect thereto were received or made by Supply. A former employee of the taxpayer commenced an action in June 1946 for alleged unpaid compensation in the sum of $219,000. The taxpayer filed an answer and took other action until November 1, 1948, when the suit was dismissed following the death of the plaintiff. The expenses of the litigation were borne partly by Supply and partly by the former stockholders of the taxpayer from whom Bethlehem Steel Company had purchased the taxpayer's stock.

The net proceeds of the sale of the taxpayer's properties and assets amounted to $894,929. This amount was credited to the taxpayer in the intercompany bank account maintained by subsidiary companies of Bethlehem Steel Corporation. No formal action to dissolve the taxpayer was ever taken. In both 1946 and 1947 there were meetings of stockholders and of the board of directors for the purpose of electing directors and officers. The balance sheets of the taxpayer as of the close of business on January 2, 1946, December 31, 1946, and December 31, 1947 were identical. The substance of these balance sheets is set out below.[1]

In 1948 the taxpayer acquired four sections of a drydock for $800,000, and in 1949 the taxpayer purchased another section. These drydock facilities represented an investment of approximately $1,500,000 at the time of the hearing before the Tax Court. The taxpayer made a business of renting the drydock.

The taxpayer did not have any excess profits net income for the taxable year 1946. It is agreed, however, that if the taxpayer is entitled to any unused excess profits credit for the year, the amount would be $74,909.27.

The Commissioner determined a deficiency in excess profits tax for the calendar year 1944 because of the disallowance of the unused excess profits credit carry-back from 1946. The Tax Court agreed with the Commissioner's determination, reasoning as follows: "The petitioner, at the beginning of 1946, disposed of the assets essential to the continued operation of the business which it had conducted with those or similar assets in 1944. Those assets were used during 1946 by Supply to carry on the business theretofore conducted by the petitioner. The results of the operation of that business during 1946 had no effect upon the petitioner but there might have been no excess profits credit to carry back to 1944 had the petitioner continued to conduct the business during 1946. Where the business was thus transferred to another and no longer operated by the petitioner, the latter was not intended by Congress to have the excess profits credit, wholly unnecessary for 1946, carried back to offset income of a year when the petitioner had operated the business * * * [citing cases]. It makes no difference that after several years the petitioner began to engage in a new and unrelated busi-

1.                    *Assets*
Accounts Receivable (inter-
  company bank account)   ..$894,929.00
                    *Capital*
Capital Stock ...............  100,000.00
Paid-in Surplus .............   46,513.56
Earned Surplus ...........  748,415.44

                            $894,929.00

ness." 1954, 23 T.C. 503, 507. The petition for review followed.

Section 710(c) (3) (A) of the Internal Revenue Code of 1939, 26 U.S.C. § 710 (c) (3) (A), governs. It provides: "If for any taxable year beginning after December 31, 1941, the taxpayer has an unused excess profits credit, such unused excess profits credit shall be an unused excess profits credit carry-back for each of the two preceding taxable years * * *." Section 710(c) (2) states: "The term 'unused excess profits credit' means the excess, if any, of the excess profits credit for any taxable year beginning after December 31, 1939, over the excess profits net income for such taxable year, computed on the basis of the excess profits credit applicable to such taxable year. * * * There shall be no unused excess profits credit for a taxable year beginning after December 31, 1946. The unused excess profits credit for a taxable year beginning in 1946 and ending in 1947 * * * [shall be prorated to January 1, 1947]." The taxpayer's taxable year 1946 was a calendar year.

■ From the face of the statute, it would appear that, if the taxpayer existed as a corporation for the entire year 1946, the carry-back is mandatory. Nonetheless, the courts have held that the mere retention of a corporate shell, without internal business substance, does not entitle a corporate taxpayer to an excess profits carry-back[2] or to spread the profits of a partial year of business over the entire year, including dormant months, to reduce its excess profits tax or to create a carry-back.[3] This is the de facto dissolution doctrine.

With few exceptions, however, the cases in which courts have applied this doctrine concerned corporations which were totally or almost completely liquidated.[4] In the case at bar, taxpayer has never been liquidated but is in fact now actively engaged in a different type of business enterprise.

Let us lay aside for the moment this factual distinction and determine whether the taxpayer would have been held to have been de facto dissolved in 1946 had it eventually been liquidated without acquiring any additional operating assets. For if the taxpayer would not have been held to have been de facto dissolved, it will be unnecessary to consider the effect of the taxpayer's subsequent drydock operations on its tax year 1946.

■■ The test of de facto corporate existence is well described in Westover Co. v. Smyth, D.C.N.D.Cal.1951, 99 F. Supp. 488, 51–2 USTC ¶ 66,019 at page 84,075,[5] as follows: "* * * not the size of the activities but their nature and purpose; not whether some other form of business organization might have sufficed but whether the form chosen was bona fide; not whether the corporation might have dissolved earlier, but whether during the period for which it is claiming the carry-back it has engaged in corporate activities so that its existence may not be disregarded." The fact that there was no liquidating dividend in the case at bar does not preclude a finding of de facto dissolution. The courts have had no difficulty in holding corporations to be de facto dissolved when funds still remained to be distributed to stockholders.[6] Here a few entries on the Bethlehem intercompany ledgers would have re-

2. ABC Brewing Corp. v. Commissioner, 9 Cir., 1955, 224 F.2d 483; Wier Long Leaf Lumber Co. v. Commissioner, 5 Cir., 1949, 173 F.2d 549 (as to the tax year 1944); Wheeler Insulated Wire Co., 1954, 22 T.C. 380; Winter & Co., 1949, 13 T.C. 108; Gorman Lumber Sales Co., 1949, 12 T.C. 1184; Rite-Way Products, Inc., 1949, 12 T.C. 475.

3. Eastern Grain Elevator Corp. v. McGowan, D.C.W.D.N.Y.1950, 95 F.Supp. 40; Diamond A Cattle Co., 1953, 21 T.C. 1; Winter & Co., note 2 supra.

4. Cases cited in notes 2 and 3 supra, except Wheeler and Winter.

5. The opinion of the court does not appear at 99 F.Supp. 488, but only the trial judge's findings of facts and conclusions of law and the judgment.

6. See cases cited in notes 2 and 3 supra, except Eastern Grain Elevator.

duced the taxpayer's status to a row of ciphers. Furthermore, all of the taxpayer's activities after January 2, 1946 relating to its original enterprise were conducted merely as agent for Supply. The taxpayer incurred no costs in winding up its old business; Supply paid all the bills, including the salaries of the taxpayer's officers. The taxpayer acquired no additional income during the winding up; Supply was entitled to such income under its contract.[7] For over two years the taxpayer's balance sheet remained exactly the same as it was on January 2, 1946. In sum, the taxpayer existed only as a name through which Supply completed its acquisition of the taxpayer's former assets, and as a page in the Bethlehem intercompany ledger. There is no decision holding a corporate taxpayer entitled to an excess profits credit on such facts; there are several decisions holding corporations with considerably more business activity, whose balance sheets were affected, not entitled to the credit.[8] Thus, unless the entry into the drydock business in 1948 changes the result, the taxpayer in the case at bar would not be entitled to an excess profits credit for the tax year 1946.

The Commissioner long contended that a corporate taxpayer which changed the nature of its business was not entitled to carry back an unused excess profits credit acquired under its new enterprise to offset excess profits taxes incurred under the old enterprise. The courts uniformly disapproved the Commissioner's contention.[9] In those cases, however, the courts stressed the continuity of the corporate taxpayer's business activity, even though the nature of the activity changed.[10] During the years for which excess profits credits were allowed, the taxpayers involved were much more than corporate shells kept alive only for purposes of tax evasion.

In the case at bar a gap of over two years occurred between the date the taxpayer disposed of those assets necessary to carry on its old business and the acquisition of the drydock sections in 1948. During the intervening period, the taxpayer served occasionally as a funnel for Supply, which had acquired all of the taxpayer's assets and liabilities, to dispose of claims arising out of the taxpayer's former operations. The hollow quality of the taxpayer's corporate existence during this period is borne out by

---

7. In many respects, the transfer of all of the taxpayer's assets and liabilities to Supply resembled a merger and when one corporation merges into another, its existence ceases for all excess profits tax calculation purposes. Pepsi Cola Co. v. Commissioner, 2 Cir., 1946, 155 F.2d 921.

8. ABC Brewing Corp. v. Commissioner; Wier Long Leaf Lumber Co. v. Commissioner, both note 2 supra; Eastern Grain Elevator Corp. v. McGowan, note 3 supra; Gorman Lumber Sales Co.; Rite-Way Products, Inc., both note 2 supra.

   Cases where courts have found sufficient business activity to entitle corporations in liquidation to excess profits credits include: C. I. R. v. Allegheny Broadcasting Corp., 3 Cir., 1950, 179 F.2d 844; Wier Long Leaf Lumber Co. v. Commissioner, note 2 supra (as to the tax year 1943); Brainard v. Scofield, D.C.W.D.Tex.1953, 140 F.Supp. 754; Myers v. United States, D.C.E.D.Ark. 1952, 140 F.Supp. 543; Justice Motor

Corp. v. McGowan, D.C.W.D.N.Y.1951, 97 F.Supp. 570; Bowman v. Glenn, D.C. W.D.Ky.1949, 84 F.Supp. 200, affirmed per curiam 6 Cir., 1950, 184 F.2d 670; Roeser & Pendleton, Inc., 1950, 15 T.C. 966. See also United States v. Kingman, 5 Cir., 1948, 170 F.2d 408; Union Bus Terminal, Inc., 1949, 12 T.C. 197, affirmed per curiam 5 Cir., 1950, 179 F.2d 399.

9. Mesaba-Cliffs Min. Co. v. Commissioner, 6 Cir., 1949, 174 F.2d 857; Westover Co. v. Smyth, D.C.N.D.Cal.1951, 99 F.Supp. 488; Jos. Capps, Inc., v. United States, D.C.S.D.Cal.1949, 86 F.Supp. 712; Whitney Manufacturing Co., 1950, 14 T.C. 1217; Alprosa Watch Corp., 1948, 11 T.C. 240. Compare Aluminum Products Co. v. United States, 1951, 101 F. Supp. 373, 121 Ct.Cl. 187.

10. See, e. g., Westover Co. v. Smyth, note 9 supra, 51–2 USTC ¶ 66,019 at page 84,074; Jos. Capps, Inc., v. United States, note 9 supra, 86 F.Supp. at page 713; Whitney Manufacturing Co., note 9 supra, 14 T.C. at page 1221.

its balance sheets, which were identical as of the close of business on January 2, 1946, December 31, 1946, and December 31, 1947. It thus appears that after January 2, 1946, the taxpayer was little more than another corporate charter lodged in the files of the Bethlehem Steel family of corporations to await the moment when Bethlehem saw fit to breathe life into it to serve some new business purpose. In such a situation, can the drydock operations undertaken in 1948 close the hiatus of corporate inactivity during 1946, 1947, and part of 1948?

There is no case directly in point. There are, however, two Tax Court decisions involving taxpayers whose charters were similarly lodged in corporate family files. See Wheeler Insulated Wire Co., 1954, 22 T.C. 380, and Winter & Co., 1949, 13 T.C. 108. In the Wheeler case, the Sperry Corp. transferred the assets of a prosperous subsidiary, Connecticut, to another subsidiary, Wheeler, so that Wheeler's excess profits credits could be used to offset Connecticut's profits. Connecticut then attempted, unsuccessfully, to claim for its own benefit an unused excess profits credit carry-back from its assetless years to its last year of active business. It does not appear from the record in the instant case whether Supply's acquisition of the taxpayer's business assets resulted in a similar tax advantage to Supply, although we are told that the taxpayer was operating at a loss at the time of the transfer of its assets and it is probable that Supply was operating at a profit. In any event, there could be only two reasons for keeping a corporation alive under the circumstances of the case at bar in 1946: to avoid taxes, or to have a spare corporate charter conveniently ready for use whenever desired by the parent corporation. Neither is a sufficient business purpose of the taxpayer to negate the Tax Court's finding that the taxpayer in the case at bar was not entitled to an unused excess profits credit carry-back from the tax year 1946.

The decision of the Tax Court will be affirmed.