James P. NEILL et al., Appellants,

v.

Robert L. PHINNEY, District Director of Internal Revenue, Appellee.

No. 16532.

United States Court of Appeals Fifth Circuit.

June 10, 1957.

646

Edward L. Wilson, W. C. Gowan, Carrington, Gowan, Johnson, Bromberg & Leeds, Dallas, Tex., for appellants.

Marvin W. Weinstein, Ellis N. Slack, Robert N. Anderson, Grant W. Wiprud, Lee A. Jackson, Attys., Dept. of Justice, Charles K. Rice, Asst. Atty. Gen., Washington, D. C., Russell B. Wine, U. S. Atty., San Antonio, Tex., for appellee.

Before HUTCHESON, Chief Judge, and JONES and BROWN, Circuit Judges.

John R. BROWN, Circuit Judge.

Appellants, starting with the truism that nothing is certain save death and taxes, seek to hasten the former to reduce the latter. For seizing upon that considerable body of law[1] delivered by us and others when the shoe was generally on the other foot, they insist that the rule is the rule whosoever's ox is being gored. With that approach, if not in their proposed result, we are in general accord for, adding a third figure, our job is to assure that what was once the goose's sauce shall for the gander now be the same, National Rag & Waste Co. v. United States, 5 Cir., 237 F.2d 846.

This all comes about this way: to meet the cost of the Korean expedition, Congress on January 3, 1951 and October 20, 1951 following its own earlier mandate,[2] first by the Excess Profits Tax Act of 1950 and later the Revenue Act of 1951, 26 U.S.C.A. Int.Rev.Acts, pages 158, 249, established a corporate excess profits tax retroactive to July 1, 1950. The question basically was: did Price Constructors, Inc., an Oklahoma corporation, depart this (tax) life, if not on December 13, 1950 when it signed its own death warrant, at least[3] by December 31, 1950 when, it is urged, with all assets and demands, claims and obligations determined and generally well in hand, there was no point in prolonging the inevitable end, or did it somehow carry on a few more months to April 30, 1951 to round out its last and fiscal year?

The Commissioner's answer was April 30, 1951. The Appellants, stockholders distributees from this dissolution by death who bear unwillingly a transferee's vicarious pro rata liability for the corporation's obligations, by their unsuccessful suit for refund claimed the earlier[4] dates. They also claim that whatever the corporate liability for excess profits tax may have been, when, on December 13, 1950, they received the sole liquidat-

---

1. Wier Long Leaf Lumber Co. v. Commissioner, 5 Cir., 173 F.2d 549; United States v. Kingman, 5 Cir., 170 F.2d 408; Union Bus Terminal, Inc., v. Commissioner, 12 T.C. 197, affirmed per curiam 5 Cir., 179 F.2d 399; A. B. C. Brewing Corp. v. Commissioner, 9 Cir., 224 F.2d 483; American Well & Prospecting Co. v. Commissioner, 3 Cir., 232 F.2d 934, certiorari denied 352 U.S. 840, 77 S.Ct. 61, 1 L.Ed.2d 57; Louise H. Edwards v. Commissioner, 12 T.C.M. 1202; Winter & Co., Inc., v. Commissioner, 13 T.C. 108; Edward R. Bacon Co. et al. v. Commissioner, 4 T.C.M. 868, affirmed per curiam 9 Cir., 158 F.2d 981; Kamin Chevrolet Co. v. Commissioner, 3 T.C. 1076; cf. Commissioner of Internal Revenue v. Allegheny Broadcasting Corp., 3 Cir., 179 F.2d 844; Brainard v. Scofield (W.D.Tex.), 1954, 1 U.S.T.C., par. 66,066.

2. Revenue Act of 1950, c. 994, 64 Stat. 906:
"SEC. 701. Excess Profits Tax.
"(a) The House Committee on Ways and Means and the Senate Committee on Finance are hereby directed to report to the respective Houses of Congress a bill for raising revenue by the levying, collection, and payment of corporate excess profits taxes with retroactive effect to October 1, or July 1, 1950, said bill to originate as required by arti-

cle I, section 7, of the Constitution. Said bill shall be reported as early as practicable during the Eighty-first Congress after November 15, 1950, if the Congress is in session in 1950 after such date; and if the Congress is not in session in 1950 after November 15, 1950, said bill shall be reported during the first session of the Eighty-second Congress, and as early as practicable during said session.
"(b) The Joint Committee on Internal Revenue Taxation, or any duly authorized subcommittee thereof, is hereby authorized and directed to make a full and complete study of the problems involved in the taxation of excess profits accruing to corporations as the result of the national defense program in which the United States is now engaged. The joint committee shall report the results of its study to the House Committee on Ways and Means and the Senate Committee on Finance as soon as practicable."

3. The calendar year end, apparently claimed for a two-day (January 3, 1951) margin of safety is not decisive, since the corporation's fiscal tax year was May 1 to April 30.

4. As there were increases in the rates of the tax effective subsequent to January 3, 1951, they also claim alternatively that death came on January 26, 1951, or if not then, at some successive times between then and April 30, 1951.

ing dividend of $1,850,000, the value of assets retained was then ample to meet all of the corporate debts including specifically an estimate of $1,114,011.76 for 1950 (May 1 to December 31, 1950) corporate income tax[5] figured without any anticipated retroactive excess profits tax. That being so, the corporation was not insolvent at the moment after distribution, and hence under Section 311 (26 U.S.C.A. § 311), there is no transferee liability whatsoever since, under the local Oklahoma law which is controlling, United States v. Truax, 5 Cir., 223 F.2d 229, the transferee of property is liable only for conveyances in fraud of creditors, that is, which are made when the transferor is insolvent or which makes him insolvent.[6]

Price Constructors, Inc. (Constructors) was organized November 3, 1949, to enable Neill, LeNoir and Gallery, officers with Harold C. Price in his family-held company, H. C. Price Company, to acquire an equity ownership in a pipe line construction enterprise. So successful was the plan that Neill and LeNoir, the principal stockholders and driving force of Constructors, by early fall of 1950 became dissatisfied since Harold C. Price, with little personal contribution, was sharing equally with them. By conferences in September–October 1950, an amicable decision was reached to liquidate and dissolve Constructors.

To effectuate this decision, a special joint meeting of stockholders and directors of Constructors was held December 1, 1950, at which time resolutions were unanimously passed adopting the proposed complete liquidation and dissolution and directing the officers to take all necessary steps, including specifically that " * * * distribution of all assets of the company be made to the shareholders pro rata * * * reserving only such sums sufficient to pay obligations accrued and accruing." The expressed purpose was that Constructors cease all business activity except that necessary to close up all current jobs and wind up the company.

Of four jobs undertaken in this short but spectacular life, one was entirely completed, two joint ventures with H. C. Price Company were entirely settled and closed by December 13, 1950, leaving only the fourth, a joint venture with Morrison Construction Company, for construction of a pipe line project for Tennessee Gas Transmission Company still open. On it, all field work had been completed by December 13, 1950, and the work thereafter done by Constructors and its associate, Morrison, concerned the orderly closing of that job, payment of outstanding bills, collection from Tennessee Gas, and distribution of profits between the joint ventures. The ultimate amount receivable by Constructors was not, and could not, have been then determined on December 13, 1950. But in the view we take, much of the controversy below and in the briefs on just when, or how, it was evaluated is now unimportant.

On December 13, 1950, the officers, pursuant to the prior dissolution authority, intending conscientiously, we believe, ad-

---

5. The intracompany estimate of FY 1950 tax made for the December 13, 1950 distribution was $1,114,011.76. On April 27, 1951, the corporation's own return showed tax liabilities for income and excess profits tax (admittedly due up to December 13, 1950, but actually calculated to December 31, 1950) for year May 1–December 31, 1950 of $1,359,988.14. Since the December 13 distribution was intended to, and did, leave the cupboard bare with just enough, but no more, bones to go around, substantial taxes, admittedly due, were not paid by the corporation:

| | |
|---|---|
| Admittedly due | $1,359,988.14 |
| Actually paid (March–April 1951) | 1,124,249.40 |
| Amount admittedly due but unpaid | $ 235,738.74 |

6. 24 Oklahoma Statutes Annotated, Sections 5 and 8, formerly Oklahoma Compiled Statutes 1921, Section 6020, construed Vacuum Oil Co. v. Quigg, 127 Okl. 61, 259 P. 858; Keaton v. Pipkins, 10 Cir., 43 F.2d 497. They cite also: Shuler v. Old Honesty Oil Co., 8 Cir., 18 F.2d 894; W. T. Rawleigh Co. v. Groseclose, 174 Okl. 193, 49 P.2d 1085; State ex

equately to provide for all of the company's debts known or likely to accrue, but forthrightly indifferent to the probable retroactive excess profits taxes which Congressional handwriting on the wall (note 2, supra,) foretold, made the first (and final) liquidating dividend of $1,850,000 in cash upon the basis of this estimate.[7]

About the same time the officers executed and subsequently filed (December 27, 1950) with the Secretary of State a notice of intention to dissolve. Constructors was proceeding under the Oklahoma[8] alternative route of dissolution by decree of a district court. However, not until May 23, 1951, was the petition filed and the *ex parte* decree of dissolution was not entered until July 16, 1951.

■ Of course, formal legal termination is not decisive, so the question re-

mains whether Constructors' expiration was *de facto*.

On the basic principles reflected by the cases, note 1, *supra*, we think it remained very much alive.

First, it was in no sense a mere shell, or semblance of its former self. Constructors, through its partner Morrison, was still engaged on a pipe line project. It is true that there were no bulldozers, trench diggers, pipe wrappers or welders at work in the field. But a multimillion dollar project of this type hardly ends when the foreman hangs up his steel hat.[9] There was yet much to do and much done. The retainage of the contract price had yet to be collected. Before this was due, the manager (Morrison) of the joint venture had to verify that all outstanding bills for labor and material had been paid, and the work

rel. Mothershead v. Mobley, 112 Okl. 152, 241 P. 155; Culp v. Trent, 99 Okl. 112, 226 P. 348; Oklahoma National Bank v. Cobb, 52 Okl. 654, 153 P. 134.

[7] Assets and liabilities after distribution of the liquidating dividend of $1,850,000:

### Assets

| | |
|---|---|
| Cash in the Bank | $ 686,154.80 |
| Due from Morrison joint venture | 598,283.11 |
| Organization Expense and deposit | 56.00 |
| | $1,284,493.91 |

### Liabilities

| | |
|---|---|
| Accrued Payroll Tax | $ 30.00 |
| Federal Withholding Tax | 1,049.00 |
| Federal Income Tax for Fiscal Year ended April 30, 1950 | 116,526.39 |
| *Provision for Federal Income Tax for Fiscal Year commenced May 1, 1950 | 1,114,011.76* |
| Provision for State Income and Franchise Taxes | 41,605.75 |
| | 1,273,222.90 |
| Margin of Solvency | $ 11,271.01 |

*Note: This ignored altogether Excess Profits tax, admittedly due if enacted, for actual operations to December 13, 1950. This accounts for the substantial underestimate and later underpayment, see note 5, supra.

8. See Oklahoma Statutes Chapter A, Sections 1.177, subd. c, 1.181, subd. c, 1.182, subds. b and c, 1.183, and 1.186, subds. b and c of 18 Oklahoma Statutes Annotated.

9. Gallery, secretary and a director of Constructors and a C.P.A. long experienced in pipe line construction matters stated:

"Q. About how long from your experience does it usually take after the work has been terminated in the field before all these cleanup items will come in to be taken care of? A. Well, customarily we have sizeable things to settle a year and eighteen months after the completion of the work."

satisfactorily performed. The retainage in the amount of $525,382.67 was not paid by Tennessee Gas to Morrison until December 28, 1950. And, once collected by the joint ventures, much remained in the final adjustment and distribution of the venture's earnings. This included verifying the amounts of outstanding accounts due to suppliers of material, and vendors, the return of materials, the adjustment of contingent claims, disposition of insurance matters and calculation of the division of profits (80% to Constructors, 20% to Morrison). It took nearly a month from the date Morrison received the retainage to make distribution on January 26, 1951, to Constructors of the amount of $598,384.11. Retrospectively this was an essential ingredient in the reconstructed estimate of the company's position as of December 13, 1950 (note 7, *supra*). The settlement receipt contract between the two joint venturers covering this payment and by which Constructors assumed its portion of contingent liabilities of the venture was not signed until February 9, 1951. And even this was not final in fact. For as late as February 9, 1951, the joint venture checking account was $149,821.01 and the account, though markedly reduced, was not closed out until December 24, 1954. Deposits totaling $22,903.35 were made on February 6, and the venture put at the disposal of Foster, the designated settling agent, nearly $27,000. The partnership federal income tax return for the Morrison joint venture had yet to be prepared and this was not completed and filed until March 2, 1951.

Second, in December and the following months of early 1951, the corporation was very much engaged in the activity of its planned dissolution. Paraphrasing more spectacular language: it had just begun to liquidate. Its plan, upon the basis of which $1,850,000 had been distributed, required that a substantial sum of unliquidated receivables be reduced to a liquid state. This was to come largely from its share of the retainage collections made by its joint venture partner from Tennessee Gas. But there was the further sum[10] of nearly $179,000 representing Constructors' portion of undistributed inventory, equipment and accumulated earnings of the venture. Changing a receivable or claimed receivables from an uncertain amount subject to many variables and contingencies into an item of over one-half million dollars in cash is, of course, a substantial accomplishment and represents like activity. The result was that by February 9, 1951, the corporation had liquid assets totaling $1,166,862.52.

Dissolution contemplates more than the garnering together of assets for distribution. It requires as well the ascertainment and discharge, not of the mere tag ends which may never be closed, but of the company's major liabilities. This included, of course, preparation of routine employer's tax returns for the previous, last, quarter, the corporation's federal income tax return, and various returns for state taxes for Oklahoma, Kentucky, Pennsylvania, New York and Tennessee where it had done extensive business. These latter totaled, in the estimate, note 7, *supra*, $41,605.75, and one (Tennessee) dragged out in an extended controversy as late as February 20, 1952. There was likewise the essential preparation of application for withdrawal from these states. And, during March and April of 1951, two payments for over $1,100,000 (note 5, *supra)* were

---

[10] The distribution January 26, 1951 by Morrison was made up as follows:

| | | |
|---|---:|---:|
| Distributed | | $598,384.41 |
| Source: | | |
| Retainage: | | |
| Received | $525,382.67 | |
| Constructors' share (80%) | 420,306.14 | |
| Undistributed earnings, equipment, etc. | 178,708.27 | $598,384.41 |

made in partial discharge of federal income tax liabilities. On April 27 over $40,000 was disbursed for tax liabilities owed to the various states. Consequently the first quarter of 1951 can be described accurately as one of successful gathering, collection, liquifying and holding of assets, and ascertainment and payment of large liabilities which exhausted all of the available funds. Certainly no earlier than April 27, 1951, had this essential task been substantially done.

On every score then we think Constructors was an active, going concern. Actually it was engaged in two acts of winding up. One, with and through its joint venturer Morrison, was a normal, expected part of the Tennessee Gas contract. What Morrison was doing—and what it was doing for itself and its associate Constructors—was performance of a pipeline building contract and the management of a joint venture. The other was the winding up of a corporation then in the process of a dissolution. Here it is a paradox that in the act of dying, the corporation is living at least during the time it is both gathering together and distributing its major assets and ascertaining and discharging its major obligations. This process, which alone enabled stockholders finally to retain, altogether or substantially that which had, in equity, merely been advanced to them in dissolution, was one which was going on through the end of Constructors' fiscal year.

Actively winding up a major construction project, actively winding up its corporate affairs, it was actively fulfilling its corporate purposes. Constructors was, on the principles so well established, note 1, supra, alive at each critical stage of the excess profits tax and the corporation was liable fully for them.

 ██ When it comes to liability as transferees, both parties below and here proceeded under the erroneous assumption that, starting with the state law, United States v. Truax, supra, in determining "the liability, at law or in equity" Section 311, 26 U.S.C.A. § 311, it was essential to show that the conveyance either made the Constructors insolvent, or was made while it was insolvent.

This gauge of transferee liability, thought to be general, is reflected in Oklahoma statutory and decisional law, note 6, supra. But the parties, in the vigorous battle over solvency (ironically of a company that in a year's time had netted nearly two million dollars from a ten thousand dollar capitalization) which, at times seesawed back and forth on a thin margin as the estimate, and its underlying assumptions, of December 13, 1950, was reconstructed, lost sight of the universal rule. Under it stockholders in dissolution are not ordinary transferees of corporate property as might, for example, be the case of a purchaser of a specific piece of its property as to whom a conveyance carries a quasi in rem liability only when in fraud of creditors. Stockholders in distribution have not purchased property. They receive only an aliquot share of property. The right to receive it flows from the accumulation of it in excess of the obligations owed and by which assets, in this or other forms, have been accumulated. Such stockholders receiving property in distribution hold it subject to pro rata liabilities of the corporation. 19 C.J.S. Corporations § 1760, p. 1541; 13 Am.Jur., Corporations, § 1352, pp. 1197-8; 8 Thompson, Corporations (3rd ed.) § 6565, p. 756, § 6574, pp. 774-5; 16 Fletcher, Cyclopedia Corporations, § 8126, p. 869 (1942); United States v. Adams, 5 Cir., 92 F.2d 395; Capps Mfg. Co. v. United States, 5 Cir., 15 F.2d 528; Koch v. United States, 10 Cir., 138 F.2d 850. The stockholders hold what they get subject to an equitable lien. "The capital and assets of a corporation constitute a trust fund, for the benefit and security of its creditors, and it is fundamental that stockholders, stripping a corporation of its assets, succeed as transferees to its tax liability. Phillips v. Commissioner, 283 U.S. 589, 51 S.Ct. 608, 75 L.Ed. 1289; Capps Mfg. Co. v. United States, 5 Cir., 15 F.2d 528; Updike v. United States, 8 Cir., 8 F.2d 913; Bankers Trust Co. v. Hale, etc., Corp., 2 Cir., 84 F.2d 401," United States

v. Adams, supra, 92 F.2d at page 396. It is, then, by an ageless principle a liability imposed "in equity," Section 311, *supra.*

█ And what is so universal in application and wise in substance ought likewise to be applied for an Oklahoma dissolution unless, by the accepted process of judicial reasoning, we are shown that Oklahoma has a different rule making the test one of solvency. But the transferees neither undertook to make, nor made, any such showing. On the contrary, a consideration of the Oklahoma Business Corporation Act, Title 18, Chapter A, Oklahoma Statutes Annotated convinces us that it is likewise the policy of Oklahoma to treat corporate assets as a trust fund for creditors. This statute does not purport to spell out the consequences of distribution in the hands of a distributee. But enacted to control the actions of corporations, not define liabilities of transferees, it makes quite plain that before any corporate assets can be distributed, the governing officers must make genuine, adequate provision for the payment of all corporate obligations.[11] And this policy is in no way undermined by other sections of the Act which, recognizing that it would be an impossibility to determine and pay or provide for every conceivable liability, establish a workable scheme which permits distribution[12] after provision for known debts and liabilities.

This statutory machinery dovetails closely with the equitable rule and thus assures that in an orderly way creditors need only look to, and treat with, the corporation or its statutory successors as an entity for the routine payment of liabilities. And, unless provision for creditors was actually inadequate, they need not incur the cost, expense, or inconvenience of tracing out property in the hands of distributee stockholders to impress a lien though, if needed, that is available.

█ Actually that is what Constructors did here. For in the May 23, 1951 application to the Oklahoma District Court for dissolution, in keeping with the mandatory provisions of the Oklahoma Business Act, positive representations were made that Constructors had settled all of its outstanding liabilities with the exception of its liability for federal excess profits taxes, and that such liability had been assumed by the shareholders. The decree of dissolution issued *ex parte* thereafter carried as a necessary ingredient an implied finding that, in the words of the statute, such liability was "adequately provided for." Perhaps this satisfies a transferee obligation imposed " * * * by law" Section 311, 26 U.S.C.A. § 311, as a matter of a simple contract assuming liabilities by those who would benefit through the distribution, and would thus afford a dual ground to Section 311 liability.

█ And it certainly demonstrates that in December, both December 1 and December 13, the responsible directors and officers were bound to know that be-

---

11. See Section 1.184, subd. a(2) relating to the general procedure upon dissolution:
"The corporation shall proceed to collect its assets, convey and dispose of its properties, pay, satisfy and discharge its liabilities and obligations and do all other acts required to liquidate its business and affairs, and, after *paying* or *adequately providing* for the payment of *all* its obligations, distribute the *remainder* of its assets, either in cash or in kind, among its shareholders according to their respective rights and interest." (Emphasis supplied.)

12. Section 1.186, subd. b, relating to dissolution by court after voluntary winding up out of court, provides:
"Upon the hearing of such petition the court may make an order declaring the corporation duly wound up, its known assets distributed, any or all franchise taxes, fees, charges, and penalties paid, and its other known debts and liabilities actually paid or adequately provided for or paid as far as its assets permit * *." And Section 1.191, subd. a, relating to distributions to shareholders, provides:
"After determining that all the known debts and liabilities of a domestic corporation, in the process of winding up, have been paid or adequately provided for, the directors shall distribute all the remaining corporate assets among the shareholders and owners of shares according to their respective rights and preferences. * * *"

fore the corporation could terminate its existence, the State of Oklahoma would require a showing that known liabilities were paid or cared for. They would know as well as of December that in all probability one of the known liabilities, at the time of final closing, would be a substantial claim for excess profits tax concerning which, under the 1950 Congressional mandate, note 2, *supra,* only the period of retroactivity (October or July 1950) and the schedule of tax rates, was really unknown.

Whether this imminent prospect created a legal liability as of December 13, 1950, United States v. Armstrong, 8 Cir., 26 F.2d 227; Updike v. United States, 8 Cir., 8 F.2d 913, certiorari denied 271 U.S. 661, 46 S.Ct. 473, 70 L.Ed. 1138; Pierce v. United States, 255 U.S. 398, 41 S.Ct. 365, 65 L.Ed. 697, it is no longer decisive since insolvency as of that date is immaterial. But it is clear that, under the Oklahoma policy assuring payment of creditors in full, the directors, at each of the successive stages, December 1, December 13, 1950, January 3, 1951 and up through April 30, 1951, were bound to take into account the probable, if not inexorable, certainty that the corporation would be subjected to substantial excess profits taxes which constitutionally could be made retroactive, Brushaber v. Union Pacific R. Co., 240 U.S. 1, 36 S.Ct. 236, 60 L.Ed. 493; Helvering v. National Grocery Co., 304 U.S. 282, 58 S.Ct. 932, 82 L.Ed. 1346; United States v. Hudson, 299 U.S. 498, 57 S.Ct. 309, 81 L.Ed. 370; Consolidated Utilities Co. v. Commissioner, 5 Cir., 84 F.2d 548; Robinette v. Commissioner, 9 Cir., 148 F.2d 513. This made it incumbent upon them to take steps to assure that, like any other asserted but contingent liability, it could be discharged when and as ascertained and reduced to tangible terms.

At the time the distribution was ordered December 13, 1950, the corporation knew it would have to represent that all liabilities *then* known were paid or provided for. As businessmen, the Directors were bound to know that some character of excess profits tax undoubtedly would be enacted and that, at the time the application for dissolution would thereafter be presented, the nature of that tax would be known and the amounts due thereunder either established or ascertainable. They could not, in ostrich-like indifference to the facts of modern life ignore this almost positive certainty and, by it, evade the payment of $235,000, note 5, *supra,* admittedly due, regardless of the disposition of the excess profits taxes of $133,985.18 for a later period.

Constructors was clearly liable for all of these taxes. The liability of the transferees was equally plain. The judgment of the District Court after an extensive trial and findings of fact, Fed.Rules Civ. Proc. rule 52(a), 28 U.S.C.A., reached the correct result.

Affirmed.